RECOMMENDED FOR FULL-TEXT PUBLICATION
Pursuant to Sixth Circuit Rule 206

File Name: 11a0238p.06

# UNITED STATES COURT OF APPEALS

## FOR THE SIXTH CIRCUIT

_____

UNITED STATES OF AMERICA,

　　　　　　　　　*Plaintiff-Appellant,*

　　　*v.*

No. 09-5783

JOSE M. CLARIOT; FRANKLIN GUZMAN;
OSCAR TOLEDO,

　　　　　　　　　*Defendants-Appellees.*

Appeal from the United States District Court
for the Middle District of Tennessee at Nashville.
No. 08-00023—John T. Nixon, District Judge.

Argued: July 26, 2011

Decided and Filed: August 25, 2011

Before: SUTTON and WHITE, Circuit Judges; STAFFORD, District Judge.[*]

_____

**COUNSEL**

**ARGUED:** Brent A. Hannafan, ASSISTANT UNITED STATES ATTORNEY, Nashville, Tennessee, for Appellant. Michael D. Noel, Brentwood, Tennessee, Jodie A. Bell, BELL, TENNENT & FROGGE, Nashville, Tennessee, Kimberly S. Hodde, HODDE & ASSOCIATES, Nashville, Tennessee, for Appellees. **ON BRIEF:** Heather G. Childs, ASSISTANT UNITED STATES ATTORNEY, Nashville, Tennessee, for Appellant. Michael D. Noel, Brentwood, Tennessee, Jodie A. Bell, BELL, TENNENT & FROGGE, Nashville, Tennessee, Kimberly S. Hodde, HODDE & ASSOCIATES, Nashville, Tennessee, Benjamin H. Perry, BALTHROP, PERRY & NOE, Ashland City, Tennessee, for Appellees.

　　　SUTTON, J., delivered the opinion of the court, in which STAFFORD, D. J., joined. WHITE, J. (p. 10), delivered a separate opinion concurring in the reversal.

_____

[*] The Honorable William H. Stafford, Jr., Senior United States District Judge for the Northern District of Florida, sitting by designation.

———————————

**OPINION**

———————————

SUTTON, Circuit Judge.  When three men landed an airplane at an unstaffed airport in Jackson, Tennessee at 9:00 p.m., local law enforcement investigated.  Five officers approached the plane, and they asked for identification.  A warrant check on the individuals came up clean and the officers returned the identifications, after which they chatted with the men about their travel plans.

Roughly ten to fifteen minutes of conversation later, the officers asked for consent to search the plane.  The pilots refused—nervously, as the officers tell it.  After declining to give consent for the search, the three men climbed back into the plane and flew to Nashville, where local police discovered 70 kilograms of cocaine hidden in the plane.  Facing federal drug charges, the three men filed a suppression motion.  Although permitting the admission of the 70 kilograms of cocaine, the district court suppressed the officers' account of what happened at the Jackson airport—the defendants' reactions to the request to search and their prompt take-off to Nashville.  Because the suppressed evidence was not the product of an illegal seizure, the exclusionary rule does not apply.  We reverse.

I.

On January 29, 2008, Franklin Guzman and Oscar Toledo flew a Cessna airplane, apparently originating in the Southwest, over rural Tennessee, with Jose Clariot as a passenger.  At 9:00 p.m., the pilots landed at an airport in Jackson, population 62,000 or so.  Having been tracking the path of the private plane, the Department of Homeland Security asked Lieutenant William Carneal of the local sheriff's office to investigate the plane after it touched down.  The plane landed after dark and after the airport staff had gone home for the day—not an everyday occurrence at the Jackson airport—prompting Carneal to call four other officers to meet him at the airport.

The officers entered the airport and approached the plane. Carneal asked Guzman whether the men needed help—they did not—then asked for identification. He took the identifications to a police car parked fifteen to twenty feet behind the airplane's tail and called the Department of Homeland Security to check whether the men had any outstanding warrants. After five to ten minutes, the agency replied that they did not. Carneal returned the identifications to the men and discussed their options for spending the night in Jackson and the possibility of leaving the plane unattended at the airport for the night.

While the officers waited to hear back from airport personnel about leaving the plane there overnight, Lieutenant Carneal asked to search the plane. According to Carneal, both Guzman and Toledo grew "nervous" and spoke anxiously back and forth. "[N]o, we are going to go, we are going to go," Guzman finally responded. After further discussion, the pilots continued to refuse permission to search the plane, then flew to Nashville.

Later that night, the three men landed in Nashville, registered their plane and took a shuttle to a hotel. Federal officers told local police that the plane had taken an irregular flight pattern, prompting the police to examine the outside of the plane with a narcotics dog, which signaled the presence of drugs. Claiming to be airport personnel, the officers called Guzman's hotel room and told him that police had expressed interest in the aircraft and would be arriving soon to inspect the plane. Guzman immediately left his room. A Nashville detective stopped him and asked to search the airplane. He consented. The officers found 70 kilograms of cocaine packed in three suitcases.

A federal grand jury indicted Guzman, Toledo and Clariot for conspiring to distribute cocaine. 21 U.S.C. §§ 841(a)(1), 846. The defendants filed a motion to suppress several pieces of evidence, including Lieutenant Carneal's testimony that the pilots appeared nervous and abruptly left the Jackson airport after he asked to search the plane. The district court suppressed Lieutenant Carneal's observations. The United States filed this interlocutory appeal. *See* 18 U.S.C. § 3731.

II.

Section 3731 provides a one-party path for interlocutory review of suppression orders. It allows the government, but not criminal defendants, to challenge a suppression ruling prior to trial. *Id.* Before us then is just one of the many Fourth Amendment questions raised by the parties below about this search: Did the district court err in suppressing Lieutenant Carneal's observations of the defendants' reactions at the Jackson airport after he took their identifications?

In suppressing this evidence, the district court made two relevant legal conclusions: (1) the initial seizure of the men (while Lieutenant Carneal checked their identifications) lacked reasonable suspicion, and (2) the evidence disclosed later in the encounter should be suppressed as the tainted fruit of an illegal seizure. The government and the defendants focus on the second conclusion, and so will we. For the purpose of deciding this case, we thus will assume for the sake of argument that the initial encounter violated the Fourth (and Fourteenth) Amendment and consider only whether the court should have applied the exclusionary rule in this setting.

The Fourth Amendment safeguards "[t]he right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures." Missing from this language, as the Supreme Court has pointed out, is anything about "precluding the use of evidence obtained in violation of its commands." *Arizona v. Evans*, 514 U.S. 1, 10 (1995). The exclusionary rule is a judicial innovation, developed by the federal and state courts in construing their respective constitutions. The first federal decision arises under the Fifth and Fourth Amendments and excludes private papers obtained through a subpoena based on self-incrimination and privacy concerns. *See Boyd v. United States*, 116 U.S. 616, 633, 638 (1886). Early state court decisions follow a similar path. *See, e.g.*, *People v. McCoy*, 45 How. Pr. 216, 217–18 (N.Y. Sup. Ct. 1873); *State v. Height*, 91 N.W. 935, 938–40 (Iowa 1902); *State v. Newcomb*, 119 S.W. 405, 409 (Mo. 1909).

In 1914, the United States Supreme Court embraced the exclusionary rule for stand-alone violations of the Fourth Amendment by federal law enforcement. *See Weeks v. United States*, 232 U.S. 383, 398.  By 1961, more than 25 state courts had embraced the exclusionary rule under their own constitutions or statutes, *see Mapp v. Ohio*, 367 U.S. 643, 651, and the Supreme Court extended the rule to state law enforcement through the Fourteenth Amendment, *id.* at 655.

The driving force behind the rule, for the last half century, has been deterrence—to discourage the police from violating the Fourth Amendment by prohibiting them from leveraging illegal encounters into criminal convictions.  *See Elkins v. United States*, 364 U.S. 206, 217 (1960).  If the courts, the thinking goes, suppress evidence of wrongdoing discovered through illegal searches and seizures, colorfully labeled the "fruit of the poisonous tree," the police will be discouraged from crossing Fourth Amendment lines in the first place. *Wong Sun v. United States*, 371 U.S. 471, 488 (1963); *Davis v. United States*, 564 U.S. __, 131 S. Ct. 2419, 2426 (2011) ("The rule's sole purpose, we have repeatedly held, is to deter future Fourth Amendment violations.").

The deterrence rationale for the exclusionary rule limits its reach.  Evidence "will not be excluded . . . unless the illegality is at least the 'but for' cause of the discovery of the evidence," unless that is "'the challenged evidence is in some sense the product of illegal governmental activity.'"  *Segura v. United States*, 468 U.S. 796, 815 (1984) (quoting *United States v. Crews*, 445 U.S. 463, 471 (1980)).  After all, there is little to deter if the officers' conduct is not the "unattenuated causation" of the evidentiary discovery. *Hudson v. Michigan*, 547 U.S. 586, 594 (2005).  Yet "but-for causality is only a necessary, not a sufficient, condition for suppression." *Id*. at 592.  In addition to the imperative of causation, a criminal suspect invoking the exclusionary rule must show that "its deterrence benefits outweigh its substantial social costs." *Pa. Bd. of Prob. & Parole v. Scott*, 524 U.S. 357, 363 (1998) (internal quotation marks omitted).  The defendants in this case come up short on both fronts.

In the first place, any causative link between the seizure and the defendants' later behavior is a stretch. The record contains no explanation why or how the warrant check caused the defendants to act nervously or to depart the airport abruptly, and they offer no such explanation on appeal. Even if we assume the seizure was illegal, it was brief and stemmed from an understandable request for identification after a moonlit landing at a small unstaffed airport. When the warrant check on the identifications yielded nothing incriminating and when the officers returned the identifications to the defendants, they were free to leave, *cf. Ohio v. Robinette*, 519 U.S. 33, 40 (1996), as indeed they did a few minutes later. Thus, even if we assume the officers seized the men while they held the defendants' identifications and ran a warrant check, any seizure became consensual once they returned the identifications and commenced a conversation that had no threatening or incriminating overtones to it.

The testimony of one of the defendants confirms that any potential causative link between the initial seizure and the defendants' visual and verbal responses to the request to search dissipated after the officers returned the identifications. Guzman testified that he heard his personal information "coming back over the radio," from which he deduced that Carneal had run a background check. Suppress. Hr'g Tr. at 438. Guzman knew the check would come back clean, so he "felt at ease at that point." *Id*. If he eventually felt "at ease" *during* the allegedly illegal seizure, how could he feel cowed after it was over—after the warrant checks had come out clean, after the identifications had been returned and after they were free to leave?

Any alleged anxiety, moreover, had nothing to do with the officers' conduct during and immediately after the initial seizure. According to Guzman, when Carneal returned the identifications, he apologized for the inconvenience, and Guzman said, "that is fine, I understand." *Id*. at 437. Carneal and the men then engaged in a friendly discussion: Carneal told Guzman, Toledo and Clariot that the officers were trying to obtain permission for the men to leave their plane unattended at the airport overnight. They chatted about whether Jackson had taxi service, and Carneal offered to drive the men to a hotel. Guzman described Carneal as "very courteous" and "friendly" during

this exchange. *Id*. at 437–38. While Carneal had been "demanding" and "intimidating" before the warrant check, "his tone of voice was totally different" and his body language "was friendly" afterward. *Id*. at 430, 432, 438.

Lieutenant Carneal's account is similar. He tried to get permission for the men to leave their plane at the airport overnight. While they waited for permission, the men discussed with Carneal whether they needed a ride to a hotel, and they were "cooperative," "polite" and "very nice." *Id*. at 64, 80, 96, 118. Only when Carneal requested consent to search the plane did Guzman "bec[o]me very nervous" and insist that the three men fly to Nashville. *Id*. at 97. Far from suggesting the earlier seizure caused them to become nervous and fly away, these facts strongly suggest, if not demonstrate, that the men would have reacted this way even without the seizure. The seizure did not cause the government's discovery of the challenged evidence, and in the absence of any cognizable claim that the disputed evidence was the "product" of illegal conduct the exclusionary rule does not apply.

Temporal proximity is the only arrow in the defendants' quiver, and it pierces nothing. No doubt, a brief gap in time between illegal police conduct and the discovery of illicit evidence is a factor in the suppression analysis, *see Brown v. Illinois*, 422 U.S. 590, 603–04 (1975), but no case (to our knowledge) holds that temporal proximity alone, without any other indicia of causation, justifies suppression. The exclusionary rule forbids the government from using evidence *caused* by an illegal seizure, not evidence found around the time of a seizure.

In view of the failure to establish any causative link between the alleged misconduct and the evidentiary discovery, it follows that the deterrent value of suppressing this evidence is small. As suggested above, the government gained no unfair advantage by its conduct, and the evidence suggests no reason why the defendants would have responded any differently had the officers asked to search the plane before, rather than after, the seizure. Carneal learned nothing during the seizure that led him to seek consent to search the plane, and nothing about the seizure caused the pilots to become nervous or to fly off. They do not argue otherwise. Where suppressing

evidence would not "yield appreciable deterrence, exclusion is clearly . . . unwarranted," *Davis*, 564 U.S. __, 131 S. Ct. at 2426–27 (internal quotation marks omitted) (alteration in original), and that is so here.

The only reason to suppress the evidence on this record is the theory, now discredited, that *all* Fourth Amendment violations must be punished by prohibiting the introduction of *any* evidence discovered after a violation, no matter how attenuated the connection to the underlying violation. As the defendants put it, "[t]he only way that police will follow the law and respect the Constitution is if [they are] prohibited from benefitting from [their] own wrongdoing." Defendants' Br. at 48. A series of recent Supreme Court cases—*Hudson, Herring* and *Davis* among them—reject this all-or-nothing-at-all approach. The approach also fails on its own terms here, as suppression is not the only deterrent available. *See, e.g.*, *Bivens v. Six Unknown Named Agents of Fed. Bureau of Narcotics*, 403 U.S. 388, 395–97 (1971); *see also* 42 U.S.C. § 1983.

The defendants add that "the Government's ability to prosecute this case is not undone by the district court's ruling." Defendants' Br. at 48. That is a fair point. If the courts are going to insist that any exclusion of evidence be proportionate to the advantage the government gained by illegal activity, defendants should be permitted to argue that the challenged evidence will not make or break the prosecution. In view of the district court's ruling that the government may introduce the 70 kilograms of cocaine found in this small plane, among other evidence, it is doubtful that the exclusion of the evidence at issue today will cause the United States to drop any charges. Also supporting the defendants' point is the de minimis value of this evidence. The exercise of a constitutional right, whether to refuse to consent to a search, to refuse to waive *Miranda* rights or to decline to testify at trial, is not evidence of guilt. *Florida v. Bostick*, 501 U.S. 429, 437 (1991); *Wainwright v. Greenfield*, 474 U.S. 284, 295 (1986); *Griffin v. California*, 380 U.S. 609, 615 (1965). And evidence of nervousness in the context of being asked to waive some of these rights is a weak, if indeed even legitimate, indicator of criminal behavior. *Florida v. Royer*, 460 U.S. 491, 507 (1983). All of this

shows that *both* sides of the exclusionary-rule balancing inquiry are weak, not that the evidence should be excluded.

The defendants argue that the United States failed to press this exclusionary-rule argument below. True or not, there can be no forfeiture "where the district court nevertheless addressed the merits of the issue." *Blackmon-Malloy v. U.S. Capitol Police Bd.*, 575 F.3d 699, 707 (D.C. Cir. 2009); *cf. United States v. Williams*, 504 U.S. 36, 40–45 (1992). No one disagrees that the district court addressed the issue. It concluded that "Defendants['] contact with police was continuous and relatively short in duration," and so the challenged evidence was not "sufficiently attenuated with respect to the earlier detention to permit exception to the exclusionary rule." Dist. Ct. Op. at 71. When a district court resolves an issue, the losing party can challenge it. Otherwise, the more surprising a district court decision in terms of resolving unbriefed and unargued points, the more insulated from review that decision would be.

III.

For these reasons, we reverse.

_____

## CONCURRING IN THE REVERSAL
_____

HELENE N. WHITE, Circuit Judge, concurring. I concur in the reversal. I agree that at the time the observations were made, the encounter was consensual and that the connection with the assertedly unconstitutional seizure is so attenuated as to remove any possible taint.