*RECOMMENDED FOR FULL-TEXT PUBLICATION*
Pursuant to Sixth Circuit I.O.P. 32.1(b)

File Name: 13a0159p.06

# UNITED STATES COURT OF APPEALS

## FOR THE SIXTH CIRCUIT

―――――――――――

UNITED STATES OF AMERICA,

               *Plaintiff-Appellant,*

     *v.*

ANIBAL FIGUEREDO-DIAZ; DARIO MORALES-LOYA,

               *Defendants-Appellees.*

No. 11-5827

Appeal from the United States District Court
for the Western District of Tennessee at Memphis.
No. 2:09-cr-20468—S. Thomas Anderson, District Judge.

Argued: December 4, 2012

Decided and Filed: June 5, 2013

Before: McKEAGUE and GRIFFIN, Circuit Judges; and DLOTT, District Judge.[*]

―――――――――――

## COUNSEL

**ARGUED:** Kevin G. Ritz, UNITED STATES ATTORNEY'S OFFICE, Memphis, Tennessee, for Appellant. Edwin A. Perry, OFFICE OF THE FEDERAL PUBLIC DEFENDER, Memphis, Tennessee, for Appellee Figueredo-Diaz. Edmund S. Sauer, BRADLEY ARANT BOULT CUMMINGS LLP, Nashville, Tennessee, for Appellee Morales-Loya. **ON BRIEF:** Kevin G. Ritz, UNITED STATES ATTORNEY'S OFFICE, Memphis, Tennessee, for Appellant. Edwin A. Perry, OFFICE OF THE FEDERAL PUBLIC DEFENDER, Memphis, Tennessee, for Appellee Figueredo-Diaz. Edmund S. Sauer, BRADLEY ARANT BOULT CUMMINGS LLP, Nashville, Tennessee, for Appellee Morales-Loya.

―――――――――――

[*]The Honorable Susan J. Dlott, Chief United States District Judge for the Southern District of Ohio, sitting by designation.

1

———————————

**OPINION**

———————————

GRIFFIN, Circuit Judge.  The government appeals an order of the district court suppressing evidence regarding defendants Anibal Figueredo-Diaz and Dario Morales-Loya.  We reverse and remand for further proceedings.

Federal agents tracked Emilio Rivas from Texas to Memphis, Tennessee, suspecting he might be trafficking drugs.  Rivas later met defendants Figueredo-Diaz and Morales-Loya, and the three drove around Memphis in multiple vehicles before finally arriving at a warehouse.  One of the vehicles was a tractor-trailer.  The tractor was registered to Rivas.  When agents moved in to investigate, defendants complied, but Rivas fled.  While a search for Rivas was ongoing, a narcotics  dog alerted the officers to the presence of controlled substances in the trailer.  The agents later recovered, among other things, one ton of marijuana under the floor of the trailer.  In the prosecution that followed, the district court ruled that defendants were unlawfully detained and, as a remedy, suppressed the marijuana evidence as to them, but not as to Rivas, whom it found was lawfully seized.  Because the recovered evidence was not the product of defendants' detention, lawful or not, suppression was not warranted.  Accordingly, we reverse and remand for further proceedings.

I.

In November 2009, Tennessee state investigator Joe Hoing, then on special assignment to the Federal Drug Enforcement Administration's Task Force, received a tip from a confidential informant.  According to the informant, a man named Emilio Rivas had earlier that morning purchased a ticket for a one-way flight from McAllen, Texas, to Memphis, Tennessee, and was scheduled to arrive later that day.  Based upon the one-way nature of the flight, the fact that the ticket was purchased with cash the day of the trip, and Hoing's awareness that McAllen is a "source city" for drug traffickers,

Hoing suspected Rivas might be engaged in drug trafficking. He decided to investigate further.

At 8:30 that morning, Hoing went to the Memphis International Airport. He called Rivas's contact number, supplied earlier by the informant, but no one answered. Hoing tried again moments later and observed a man (later identified as Rivas) talking on a cell phone. Rivas then pulled a second phone from his pocket and answered Hoing's call. Hoing immediately hung up and began following Rivas.

Hoing and his team tracked Rivas to the Kettle Restaurant in Memphis. There, Rivas, while on the phone, approached one of the several tractor-trailers in the parking lot and climbed into the driver's seat. Defendant Anibal Figueredo-Diaz was waiting in the passenger's seat. Hoing checked the license of the vehicle and discovered that the tractor was registered to Rivas. After a few minutes, Figueredo-Diaz got out and walked to a nearby gas station. Minutes later, Rivas also exited and proceeded to briefly examine the trailer's undercarriage before climbing back into the driver's seat. Figueredo-Diaz returned from the gas station and retook the passenger's seat. Still on the phone, Rivas got out again and this time walked to the road, observing the traffic. A black Chevy Blazer driven by defendant Dario Morales-Loya pulled into the parking lot. Rivas got in and the two drove away. Figueredo-Diaz followed, driving the tractor-trailer.

Hoing's team tracked both vehicles as they headed southbound on Interstate 55 to a truck stop. The Blazer drove through the parking lot of the truck stop while Figueredo-Diaz parked the tractor-trailer. Hoing instructed an officer to stay with the truck as Hoing continued to follow the Blazer.

The Blazer continued southbound into Mississippi and eventually pulled into a driveway that led to a small house or office adjacent to a warehouse. Morales-Loya and Rivas went into the warehouse and then the adjacent building. Minutes later, a white Buick bearing Mississippi license plates and registered to a man named Simon Loya

arrived.[1] The unidentified Hispanic man driving it joined Rivas and Morales-Loya in the house or office. All three men later emerged. While Morales-Loya remained at the scene, Rivas and the unidentified man departed in the Buick and drove to the truck stop, where Figueredo-Diaz was waiting in the tractor-trailer. From the truck stop, both vehicles proceeded back to the warehouse.

The four men—Rivas, defendants Morales-Loya and Figueredo-Diaz, and the unidentified man—huddled around the rear of the trailer with its doors wide open. Hoing's crew, all identified in police clothing, approached the men for the purpose of conducting a *Terry* investigative stop. The four men responded differently. Figueredo-Diaz and Morales-Loya were detained without incident. However, Rivas and the unidentified man fled. The officers pursued them and eventually apprehended Rivas, but the unidentified individual escaped.

While the agents were chasing Rivas, an officer from the Olive Branch Police Department arrived at the scene with a narcotics detection dog. The officer walked the dog along the outside of the tractor-trailer and the dog alerted to the presence of narcotics. The dog likewise alerted for the presence of drugs regarding the Blazer, the Buick, and a van inside the warehouse. Officers searched all four vehicles, but discovered no drugs.

After Rivas was captured, Hoing returned to the warehouse and walked his own drug dog along the inside of the trailer. Hoing's dog also gave a positive alert. Because Hoing recalled Rivas inspecting the underside of the trailer at the restaurant earlier that day, the agents decided to search the underside of the trailer. There they discovered over 2,100 pounds of marijuana secreted in the trailer's undercarriage. Additionally, in the tractor's cab, the agents found $12,000 in cash, along with Figueredo-Diaz's passport and debit card.

---

[1] Hoing had previously been part of investigations in the Northern Mississippi and Memphis areas that involved individuals with the last name of Loya. One, in August 2004, involved the delivery of 1,500 pounds of marijuana to a business associated with a Loya. It likewise involved a tractor-trailer and a warehouse. The other, in June 2007, ended in police seizing 1,500 pounds of marijuana. Hoing conceded at the evidentiary hearing that "Loya" is a common Hispanic name. Although he didn't know for sure, he had a hunch that Simon Loya was related to the other Loyas he had investigated.

The government charged Figueredo-Diaz, Morales-Loya, and Rivas with conspiracy to possess with intent to distribute at least 100 kilograms of marijuana, and possession with intent to distribute the same. *See* 21 U.S.C. §§ 841(a)(1), 846. All three moved to suppress the evidence seized in the search, claiming it was the fruit of their allegedly unlawful detention. A magistrate judge heard testimony and recommended denying the motions on the ground that the agents had reasonable suspicion to detain the three men. The district court followed the recommendation in part and rejected it in part, suppressing the evidence as to defendants Figueredo-Diaz and Morales-Loya but declining to do so for Rivas. The government timely filed this interlocutory appeal of the suppression order regarding Figueredo-Diaz and Morales-Loya. *See* 18 U.S.C. § 3731.

II.

On appeal of a district court's suppression ruling, we review its legal conclusions de novo and its factual findings for clear error. *United States v. Beals*, 698 F.3d 248, 263 (6th Cir. 2012).

The district court made the following relevant legal conclusions: (1) the agents had reasonable suspicion to detain Rivas to further investigate potential criminal activity, including having drug dogs sniff the tractor-trailer, making suppression unavailing as to him; (2) the agents *lacked* reasonable suspicion to detain defendants Figueredo-Diaz and Morales-Loya; (3) "as a result of" defendants' illegal detention, the agents brought in drug dogs and later recovered the evidence, making suppression warranted as to Figueredo-Diaz and Morales-Loya; and (4) the inevitable-discovery doctrine did not render the evidence admissible. The government challenges the conclusions favorable to defendants. We do not decide whether defendants' detention was unlawful, because we hold that it did not *cause* the agents to discover any evidence. For this reason, the district court erred in suppressing the evidence.

The district court ruled that the agents had reasonable suspicion to search for and detain Rivas in light of the following: (1) the reliable tip; (2) the observations of the agents while tracking Rivas in and around Memphis; (3) the similarities between what

the agents observed and the two drug busts Hoing made years earlier involving individuals named Loya; and (4) most importantly, Rivas's flight once the officers approached.**2** Defendants do not challenge this determination on appeal. Nor is it clear that we could consider such a challenge given our limited interlocutory appellate jurisdiction in criminal matters. *See* 18 U.S.C. § 3731 (authorizing *the government*, but not criminal defendants, to challenge suppression rulings prior to trial); *United States v. Clariot*, 655 F.3d 550, 552 (6th Cir. 2011).**3** Accordingly, it is not disputed that the agents had reasonable suspicion to detain Rivas. From this premise, the government argues, assuming arguendo that the detention of Figueredo-Diaz and Morales-Loya was unlawful, the suppression of the evidence was not warranted because it would have been discovered in the course of the agents' lawful detention of Rivas. Indeed, it was so discovered.

## III.

The Fourth Amendment safeguards "[t]he right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures." U.S. Const. amend. IV. However, the amendment itself prescribes no means of enforcement. *See Arizona v. Evans*, 514 U.S. 1, 10 (1995) ("[T]he Fourth Amendment contains no provision expressly precluding the use of evidence obtained in violation of its commands."). Rather, the exclusionary rule is "a judicial innovation, developed by the federal and state courts in construing their respective constitutions," *Clariot*, 655 F.3d at 553, that operates to exclude from trial "not only primary evidence obtained as a direct

---

**2**Reasonable suspicion for a stop cannot logically be based on events that occur after the suspect is seized. *United States v. Johnson*, 620 F.3d 685, 696 (6th Cir. 2010). In view of Rivas's flight, the district court found that Rivas was not seized when the agents approached. *See Brendlin v. California*, 551 U.S. 249, 254 (2007) (explaining that "there is no seizure without actual submission").

**3**Although a defendant may, during the government's interlocutory appeal, raise alternative arguments in support of suppression, he may not raise arguments that, if sustained, would mean suppressing *additional* evidence. *United States v. Shameizadeh*, 41 F.3d 266, 267 (6th Cir. 1994). Such arguments must await an appeal from a final judgment. Here, if we sustained an argument that police lacked reasonable suspicion to detain Rivas, it would likely result in suppression—as to *Rivas*—of the evidence seized from the tractor-trailer, evidence that the district court did not suppress. The same is true of defendants' extended argument regarding the legality of the dog sniffs. We leave it to the district court on remand to take up any arguments defendants may wish to make in the wake of the Supreme Court's recent decision in *Florida v. Jardines*, 133 S. Ct. 1409 (2013). Whether any such arguments are preserved we leave to the district court.

result of an illegal search or seizure, but also evidence later discovered and found to be derivative of an illegality or 'fruit of the poisonous tree,'" *Segura v. United States*, 468 U.S. 796, 804 (1984) (internal citation omitted).

Application of the exclusionary rule is not automatic. In other words, exclusion is not "a necessary consequence of a Fourth Amendment violation." *Herring v. United States*, 555 U.S. 135, 141 (2009). That is largely because "[t]he wrong condemned by the Amendment is 'fully accomplished' by the unlawful search or seizure itself," and excluding the evidence could in no way "'cure the invasion of the defendant's rights which he has already suffered.'" *United States v. Leon*, 468 U.S. 897, 906 (1984) (quoting *Stone v. Powell*, 428 U.S. 465, 540 (1976) (White, J., dissenting)). Instead of seeking "to repair" one's Fourth Amendment rights once violated, the exclusionary rule aims "to prevent" future violations of the Fourth Amendment, "by removing the incentive to disregard it." *Elkins v. United States*, 364 U.S. 206, 217 (1960). Indeed, deterring future violations is the "sole purpose" of the exclusionary rule. *Davis v. United States*, 131 S. Ct. 2419, 2426 (2011).

The deterrence rationale for the exclusionary rule limits and guides its reach. *Clariot*, 655 F.3d at 553. "Evidence 'will not be excluded . . . unless the illegality is at least the "but for" cause of the discovery of the evidence,' unless that is 'the challenged evidence is in some sense the product of illegal governmental activity.'" *Id.* (quoting *Segura*, 468 U.S. at 815). For there is little to deter "if the officers' conduct is not the 'unattenuated causation' of the evidentiary discovery." *Id.* (citing *Hudson v. Michigan*, 547 U.S. 586, 594 (2006)). And even if recovered evidence *is* the product of illegality, it will be suppressed only where doing so yields deterrence benefits that sufficiently outweigh the substantial social costs associated with exclusion. *See id.* at 553–54.

A.

The Supreme Court has recognized various doctrines, sometimes referred to as "exceptions" to the exclusionary rule, that offer guidance for its proper application. One exception, relied upon by the government, is the inevitable-discovery doctrine, which provides that evidence secured through unlawful means is admissible if the prosecution

can show that it "ultimately or inevitably would have been discovered by lawful means[.]" *Nix v. Williams*, 467 U.S. 431, 444 (1984). For example, if a defendant's coerced statement leads police to recover a dead body, evidence of the body, including its condition as shown by the autopsy, is admissible at trial if the prosecution shows that the body would have been discovered lawfully, by other means such as a volunteer search already underway that would have covered the field where the body was located. *See id.* at 444–50. The doctrine demonstrates the exclusionary rule's aim of deterrence: for even where discovered evidence is the undoubted product of illegality, "[i]f the prosecution can establish by a preponderance of the evidence that the information ultimately or inevitably would have been discovered by lawful means . . . [,] then the deterrence rationale has so little basis that the evidence should be received." *Id.* at 444.

In the present case, the government argues that the evidence seized from the tractor-trailer should not be suppressed, despite defendants' alleged unlawful detention, because it "inevitably" would have been discovered during the investigation of Rivas, which the district court found was lawful. This argument is somewhat misdirected. The inevitable-discovery doctrine applies only where the defendant's unlawful detention *actually caused* the evidentiary discovery. In *Nix*, for example, the defendant's unlawfully-obtained statement "indeed led police to the child's body," and so an inevitable-discovery analysis was appropriate. 467 U.S. at 443–44. But here, defendants' detention did not cause the agents to discover any evidence. Accordingly, there is no basis to apply the inevitable-discovery doctrine.[4]

---

[4]Morales-Loya claims the government forfeited any argument against suppression not expressly rooted in inevitable discovery by invoking *only* that doctrine in this case. We disagree. Although the government uses the phrase "inevitable discovery" throughout its briefs, its arguments are decidedly causative in substance. *See, e.g.*, Br. 30 ("Thus, under the court's own legal analysis, the officers had probable cause to search the trailer, and the drugs were lawfully seized. It simply did not matter whether there was anyone else on the premises, and whether constitutional rights had been violated."); Reply Br. 6–7 ("There is nothing in the record to support the district court's ruling that 'had the DEA agents not approached and improperly detained [defendants], then the canine sniff of the vehicles on the premises would not have followed.' The canine sniff stemmed not from any interaction between [defendants] and officers, but rather from the suspicious activities and flight of Rivas and the unidentified male."). And because the district court specifically addressed causation by finding that the evidentiary discovery occurred "as the result of the exploitation of a primary illegality" (*i.e.*, defendants' seizure), the government may challenge that holding on appeal. *See Clariot*, 655 F.3d at 556 (no forfeiture where the district court addresses the merits of the issue raised on appeal).

B.

The well-established principles regarding causation control the present case. Their application is the reason that suppression is not warranted. Here, the agents discovered contraband in the tractor-trailer wholly apart from their detention of Figueredo-Diaz and Morales-Loya; the defendants' detention was entirely superfluous so far as the discovery of evidence is concerned. A positive indication from a narcotics-detection dog supplied the agents with probable cause to search the tractor-trailer without a warrant. *See Florida v. Harris*, 133 S. Ct. 1050, 1057 (2013) (an alert by a properly trained dog can establish probable cause for a search); *Carroll v. United States*, 267 U.S. 132, 153 (1925) (warrantless vehicle searches are reasonable if supported by probable cause). It was the agents' reasonable suspicion *regarding Rivas* that led them to detain the tractor-trailer long enough for a dog to sniff it; the sniff, in other words, was completely dependent *upon Rivas's* conduct, and had nothing to do with defendants being detained. Hoing's unchallenged testimony was that the decision to run a drug dog by the tractor-trailer was made once (and *because*) Rivas and the other individual fled, and that the dog sniff was going to happen regardless of whether Figueredo-Diaz and Morales-Loya were there. Therefore, defendants' detention did not *cause* the government's discovery of the challenged evidence. Put another way, the agents did not "exploit[]" defendants' seizure to discover the evidence; it was discovered "by means sufficiently distinguishable" from that seizure. *See Wong Sun v. United States*, 371 U.S. 471, 487–88 (1963). Defendants' case for suppression therefore fails on the requirement of causation: "The exclusionary rule forbids the government from using evidence *caused* by an illegal seizure, not evidence found around the time of a seizure." *Clariot*, 655 F.3d at 555. It does not apply here.

Supporting this result is the fact that suppressing the evidence here would put the government in a *worse* position than it would have been in had the agents never detained defendants and simply let them leave. The exclusionary rule, when properly applied, places the government in *no better* a position as a result of its misdeeds, not a worse one. *See Nix*, 467 U.S. at 443–44. Whether defendants were detained made *no difference*

with respect to the recovery of evidence, because the agents still would have run a dog by the tractor-trailer and obtained probable cause for the search.

The reasoning employed in *United States v. Howard*, 621 F.3d 433 (6th Cir. 2010), supports our conclusion. In *Howard*, the defendant was arrested without probable cause. *Id.* at 451. Notwithstanding the lack of probable cause, reasonable suspicion existed to detain him briefly while officers investigated a potential drug deal in which they reasonably suspected he was involved. During the investigation, a drug dog sniffed the exterior of the defendant's vehicle and alerted to the presence of drugs. The officers searched the vehicle and found a shoebox containing $95,000 in cash. We refused to suppress the cash, ruling that it was not *the result of* the unlawful arrest. *Id.* at 452. We stated that the "officers' display of authority and use of force to detain him did not create the circumstances that led to Titan sniffing the Suburban"; the *reasonable suspicion* did, and it existed "entirely independent" of the arrest, even though it was part of the same investigation. *Id.* at 453; *see also United States v. Garcia*, 496 F.3d 495, 503 (6th Cir. 2007). In a similar way, reasonable suspicion of Rivas led the agents to detain the tractor-trailer, deploy a drug dog, and, later, search the vehicle and discover evidence; that suspicion existed wholly apart from defendants' detention.

Offering further support is *United States v. Carter*, 14 F.3d 1150 (6th Cir. 1994). There, the defendant was a passenger in a vehicle stopped for a traffic infraction. During the stop, police unlawfully arrested the driver, so his later-given consent to search the vehicle was tainted. Officers recovered several hundred pounds of marijuana during the unlawful search. We acknowledged the defendant's legal ability, his "standing," to challenge the basis for the traffic stop,[5] but he never argued it was unlawful; he instead claimed he was illegally detained *once the driver had been arrested*, and we assumed he was right. Upholding the ruling against suppression, we held that "it was the arrest

---

[5]This conclusion accords with the Supreme Court's holding in *Brendlin v. California*, 551 U.S. 249 (2007), that passengers are "seized" in traffic stops and may therefore challenge the offered basis for the stop. *Id.* at 257. If the challenge is successful, all evidentiary fruit of the illegal stop is properly suppressed. *See United States v. Ellis*, 497 F.3d 606, 612 (6th Cir. 2007). A passenger may also challenge his prolonged detention during a lawful traffic stop and seek to exclude evidence that flows therefrom. *See, e.g.*, *id.*; *U.S. v. Torres-Ramos*, 536 F.3d 542, 549–53 (6th Cir. 2008).

of the driver and the seizure of the driver's vehicle that led to the discovery of the marijuana, not any violation of the defendant's rights." *Id.* at 1151. In other words, the defendant's detention "was not the proximate cause of the search of the van," so the marijuana could not be "fruit" of that detention. *Id.* at 1154–55. We explained: "Suppose that at the time of the driver's arrest the police had summoned a taxi cab for [the defendant] and told him he was free to leave. The marijuana would still have been discovered, because it was located in a van owned and controlled by [the driver] (who was not going anywhere until his vehicle had been searched) and not in a vehicle controlled by [the defendant]." *Id.* at 1154; *see also United States v. DeLuca*, 269 F.3d 1128, 1133 (10th Cir. 2001). Likewise here: had Figueredo-Diaz and Morales-Loya been allowed to leave, the marijuana still would have been discovered and seized.

Resisting this conclusion, defendants argue that no search (and therefore no discovery of evidence) would have occurred had they not been detained. Defendants contend that they would have departed from the scene and taken the tractor-trailer with them. After all, Figueredo-Diaz drove the tractor-trailer to the warehouse and was thus positioned to drive it away were he allowed to leave. If defendants are correct, their detention *did cause* the discovery. However, they are wrong. We conclude it clear beyond doubt that the agents would not have allowed that scenario to occur. Given the agents' reasonable suspicion that Rivas was using the tractor-trailer to traffic drugs and their knowledge that Rivas owned the tractor, they had authority to detain the vehicle at least briefly. *See Howard*, 621 F.3d at 452. A conclusion that the agents would have permitted Figueredo-Diaz to depart in the tractor-trailer—a vehicle the agents had followed all morning and reasonably believed was being used to traffic drugs—is untenable.

## C.

Next, Morales-Loya argues that strong policy reasons exist for applying the exclusionary rule in these circumstances. He contends that not suppressing the evidence "would, as a practical matter, operate to nullify important Fourth Amendment safeguards." (Quoting 6 Wayne R. LaFave, *Search & Seizure: A Treatise on the Fourth*

*Amendment* § 11.4(a) (4th ed. 2004)).  It may make sense to suppress evidence, even where an exception to the exclusionary rule applies, if doing so yields appreciable deterrence benefits and safeguards the Fourth Amendment.  The rule's touchstone is deterrence.  In *United States v. Quinney*, for example, we rejected the government's claim that a warrantless seizure of evidence from the defendant's home should not be suppressed because officers had probable cause for the search and inevitably would have obtained a warrant.  583 F.3d 891, 894 (6th Cir. 2009).  We did not dispute that the inevitable-discovery doctrine technically applied, but instead reasoned that applying it under those circumstances "would completely obviate the warrant requirement."  *Id.* (citation and internal quotation marks omitted); *see also, e.g.*, *United States v. Griffin*, 502 F.2d 959, 961 (6th Cir. 1974) (per curiam).  Police would have little incentive in the future to obtain a warrant if we sustained such an argument.

Similarly, Morales-Loya contends that suppressing the evidence here safeguards the particularity requirement.  Declining to do so, he argues, would encourage officers to detain a group of individuals even when cause exists with respect to just one in the group, because they would know beforehand that any evidence recovered could be offered at trial against the entire group.  This would eventually lead officers to avoid the requirement that they "have a particularized and objective basis for suspecting *the particular person* stopped of criminal activity."  *United States v. Cortez*, 449 U.S. 411, 417–18 (1981) (emphasis added).

We evaluate the incentives differently.  What could the agents have hoped to gain by unlawfully detaining Figueredo-Diaz and Morales-Loya?  Very little, we conclude.  Incriminating statements made by either man, as well as evidence recovered from his person, would be suppressed as to the speaker, or the victim of the search, as the product of his unlawful detention.  *See, e.g.*, *United States v. Buchanon*, 72 F.3d 1217, 1226 (6th Cir. 1995); *see also Rakas v. Illinois*, 439 U.S. 128, 133–34 (1978) (explaining that one may not assert the Fourth Amendment rights of another by seeking to suppress the fruits of the other's unlawful seizure).  The same would likely be true of evidence later obtained *because of* such statements, so that if either illegally detained defendant had

mentioned the location of a stash house, which then caused police to obtain a warrant to search the house, drugs and other evidence discovered during the search in all likelihood would be suppressed as to the one who made the statement. Likewise, Morales-Loya could probably obtain suppression of drugs or contraband recovered during a search of his Blazer were it determined that the agents unlawfully detained him and thereby prevented him from driving his vehicle away before a dog could sniff it (provided, of course, no other basis existed to detain the vehicle). The prospect of forfeiting the admission of such valuable evidence because of Fourth Amendment violations is considerable and sufficiently discourages non-particularized seizures.

IV.

For these reasons, we reverse and remand for further proceedings.