**UNITED STATES of America,**
**Plaintiff–Appellant**

v.

**Samuel Duane JOHNSON, Jr.,**
**Defendant–Appellee.**

No. 14–2549.

United States Court of Appeals, Sixth Circuit.

Nov. 23, 2015.

BEFORE: COLE, Chief Judge; DAUGHTREY and DONALD, Circuit Judges.

OPINION

COLE, Chief Judge.

The United States appeals the district court's order suppressing a firearm found in defendant Samuel Johnson's car during a traffic stop. The district court ruled that because the police had unconstitutionally seized Johnson before he rolled through a stop sign, this traffic violation could not justify the stop. Considering all the facts and circumstances, we conclude

that Johnson's actions did not objectively demonstrate that he had submitted to police authority before he ran the stop sign, and he therefore was not seized before this violation. Accordingly, we reverse.

## I. Background

Johnson worked as a pizza delivery manager in Flint, Michigan. He left work just before 1:45 a.m. the morning of May 25, 2012, and dropped off a co-worker before proceeding home.

Around 1:48 a.m., Johnson was driving east on Cooper Avenue. Johnson says that as he approached the stop sign at the intersection of Cooper Avenue and Wisner Street, he saw a Michigan State Police cruiser stopped about a block away, facing south. Johnson says he put on his blinker, came to a complete stop, then turned right and proceeded south on Wisner Street.

The Michigan State Police cruiser was being driven by Sergeant (then-Trooper) Bradley Ross. Ross's account differs from Johnson's. Ross says he was driving west on Cooper when he passed Johnson's car, which was headed east. Ross testified that Johnson rolled through the stop sign at the intersection of Cooper and Wisner. Ross then turned his car around to head back east on Cooper, turned south on Wisner, and followed Johnson.

With Ross in the patrol car was his partner, Trooper Jason Walters. Walters does not recall seeing Johnson roll through the stop sign at Cooper and Wisner, nor does he remember Ross turning the car around to pursue Johnson. According to Walters, one reason he could not remember the details of this particular stop was that he and Ross had been on a "directed patrol," where the state police proactively patrol neighborhoods—especially high crime neighborhoods like the one where Johnson was driving. Under directed patrol, police officers strictly enforce traffic laws, making as many as 30 stops in a night.

Regardless of whether Johnson actually rolled through the stop sign or not, the police began following him south on Wisner, a long block measuring approximately 600 feet. The police activated their lights somewhere between half and two-thirds of the way down the block. Johnson, purportedly fearing police brutality, decided not to stop on Wisner, which was dark, deserted, and in a dangerous neighborhood. Johnson continued driving the remaining few hundred feet to the end of the block, activated his turn signal, and turned right onto Myrtle Avenue. In making this turn onto Myrtle, Johnson did not come to a full stop at a stop sign at the intersection of Wisner and Myrtle. He then turned right into the BP gas station about a hundred feet down the block on Myrtle, where he pulled up to a gas pump and stopped his car.

Once Johnson was stopped, Ross and Walters exited their vehicle and approached Johnson's car. Ross asked Johnson for his driver's license. Johnson, who had been without a valid license for several years, handed Ross a Michigan identification card instead. Because Johnson had not produced a driver's license, Ross asked Johnson to step out of his car. Johnson initially refused but eventually agreed after Ross repeated his instruction.

As Johnson exited the vehicle, Ross saw a revolver lying on the car's floor by the open door. Ross immediately attempted to handcuff Johnson. Johnson, however, broke away and began running. After a brief chase, Ross and Walters caught Johnson and arrested him.

A grand jury in the Eastern District of Michigan subsequently indicted Johnson on one count of being a felon in possession

of a firearm in violation of 18 U.S.C. § 922(g)(1).

Johnson moved to suppress the revolver. The motion was referred to a magistrate judge. After conducting two evidentiary hearings at which Ross, Walters, and Johnson testified, the magistrate judge issued a report and recommendation ("R & R") that Johnson's motion be denied. Johnson timely objected to the R & R.

The district court—without conducting a hearing—rejected the R & R and granted Johnson's motion to suppress. The district court found initially that the government had not proved that the first rolling stop ever occurred; thus it could not have provided the officers probable cause to stop Johnson. In making that determination, the district court found Johnson more credible than Ross, noting both that Ross and Walters told inconsistent stories, and also that the practice of "proactive traffic policing" through directed patrols may have given them an incentive to fabricate traffic violations so they could search vehicles for weapons and drugs.[1]

The district court next found that the second infraction—rolling through the stop sign at the intersection of Wisner and Myrtle—could not independently justify the stop. The district court held that because the evidence showed Johnson did not flee when the police activated their lights without probable cause, he was seized for Fourth Amendment purposes from this point. Consequently, the second rolling stop could not give the police probable cause after the fact. Because the revolver was discovered as a result of an unlawful seizure, the district court suppressed it.

The government timely appealed the district court's order. 18 U.S.C. § 3731. The government asks us to review the second issue: whether Johnson was already seized by the time he rolled through the second stop sign.

## II. Analysis

We review a district court's legal conclusion regarding the point at which seizure occurred "de novo based upon underlying factual findings that will only be disturbed if clearly erroneous." *United States v. Buchanon*, 72 F.3d 1217, 1223 (6th Cir. 1995). In doing so, we "must consider the evidence in the light most favorable to the district court's decision." *United States v. McCauley*, 548 F.3d 440, 443 (6th Cir. 2008).

The Fourth Amendment protects "[t]he right of the people to be secure in their persons ... against unreasonable searches and seizures." U.S. Const. amend. IV. Two things must happen for someone to be "seized." First, as a result of intentional police conduct, "'a reasonable person [must] believe[ ] that he [is] not free to leave.'" *Michigan v. Chesternut*, 486 U.S. 567, 573, 108 S.Ct. 1975, 100 L.Ed.2d 565

---

1. Although the United States has not appealed the district court's determination that the first rolling stop did not occur, the district court made its credibility determinations without the benefit of a new hearing. We have noted previously that there is "an open question in this circuit whether a district court can reject a magistrate judge's credibility determinations without holding a new hearing," *United States v. Bailey*, 302 F.3d 652, 657 n. 5 (6th Cir.2002). Despite the openness of this question, it would seem that the best practice for a district court would be to hold a new hearing before rejecting a magistrate judge's credibility determination. *See United States v. Raddatz*, 447 U.S. 667, 681 n. 7, 100 S.Ct. 2406, 65 L.Ed.2d 424 (1980) ("[W]e assume it is unlikely that a district judge would *reject* a magistrate's proposed findings on credibility when those findings are dispositive and substitute the judge's own appraisal; to do so without seeing and hearing the witness or witnesses whose credibility is in question could well give rise to serious questions....").

(1988) (quoting *United States v. Mendenhall,* 446 U.S. 544, 554, 100 S.Ct. 1870, 64 L.Ed.2d 497 (1980) (opinion of Stewart, J.)). Second, "an individual must actually yield to the show of authority." *United States v. Johnson,* 620 F.3d 685, 690 (6th Cir.2010). Yielding to authority requires either that the police use physical force or that the person demonstrate submission to the police. *California v. Hodari D.,* 499 U.S. 621, 626, 111 S.Ct. 1547, 113 L.Ed.2d 690 (1991).

We review the lawfulness of a seizure at the point it occurs. *McCauley,* 548 F.3d at 443. Failing to stop completely at a stop sign is a civil infraction in Michigan. Mich. Comp. Laws §§ 257.649(6), (8). Thus, the police would have been justified in seizing Johnson for rolling through the second stop sign as they had probable cause to believe he had committed a civil traffic infraction (albeit a minor one). *See United States v. Blair,* 524 F.3d 740, 748 (6th Cir.2008). Both sides agree, however, that if Johnson was unlawfully seized before he rolled through the second stop sign, the traffic infraction could not have justified the seizure. *See United States v. Figueredo–Diaz,* 718 F.3d 568, 573 n. 2 (6th Cir.2013) ("Reasonable suspicion for a stop cannot logically be based on events that occur after the suspect is seized.").

In this case, the police unquestionably asserted their authority by activating the lights on their patrol car. *Brower v. Cnty. of Inyo,* 489 U.S. 593, 597, 109 S.Ct. 1378, 103 L.Ed.2d 628 (1989). Johnson saw this and understood that he was not free to leave. Because the police did not use physical force to stop Johnson's car, the only question we need to answer is when he should be deemed to have submitted to their authority, *i.e.,* did he submit before or after he ran the second stop sign.

Determining when a person has submitted to police authority is an objective inquiry that takes into account all the facts and circumstances of the stop. *United States v. Salazar,* 609 F.3d 1059, 1064 (10th Cir.2010) (citing *United States v. Cardoza,* 129 F.3d 6, 14 n. 4 (1st Cir.1997)). In the context of a traffic stop, the Supreme Court has consistently held that once a car has stopped, all of its occupants have been seized for Fourth Amendment purposes. *E.g., Brendlin v. California,* 551 U.S. 249, 255–56, 127 S.Ct. 2400, 168 L.Ed.2d 132 (2007). But there is still a question of whether, in order for there to be a seizure, it is *necessary* for the car to be stopped, or merely *sufficient.*

In its briefing, the government largely advocates the view that seizure occurs at the moment when the motorist stops, because only at this point do the officers definitively know the motorist's intent. At oral argument, however, the government appropriately abandoned its argument for such a strict rule. The Supreme Court has consistently rejected bright-line tests to determine whether a seizure has occurred for Fourth Amendment purposes. Instead, a court "must take into account all of the circumstances surrounding the incident in each individual case." *Chesternut,* 486 U.S. at 572, 108 S.Ct. 1975 (internal quotation marks omitted).

Being seized can mean moving in a particular way in response to an officer's order. "[W]hat may amount to submission depends on what a person was doing before the show of authority." *Brendlin,* 551 U.S. at 262, 127 S.Ct. 2400. "Physical movement alone does not negate the possibility that a seizure may nevertheless have occurred." *United States v. Wilson,* 953 F.2d 116, 123 (4th Cir.1991); *accord Salazar,* 609 F.3d at 1066–67 (suspect seized when he complied with officer's order to exit his vehicle). Changing one's driving in response to police authority could be enough to signal submission in the right

circumstances. Even the government conceded in its briefing that in certain situations—for example, where the police activate their lights in a one-lane construction zone where there is no room to pull over—the motorist may be deemed seized from the time she clearly signals her submission—by, for example, slowing down and activating her hazard lights.

The district court here held that because Johnson did not flee, he was seized for Fourth Amendment purposes before he rolled through the second stop sign. But there must be some conduct that falls between "not fleeing" and "submitting." *See United States v. Waterman,* 569 F.3d 144, 146 n. 3 (3d Cir.2009) ("Although *Hodari D.* involved a suspect engaged in headlong flight, we have since examined acts of defiance that are less overt."). Fleeing can end a seizure that has already begun. *See Hodari D.,* 499 U.S. at 625–26, 111 S.Ct. 1547. For example, in this case Johnson's fleeing when the officers tried to handcuff him terminated the seizure. Fleeing can also prevent a seizure from taking place in the first instance. But until the suspect motorist objectively demonstrates actual submission, he has not been seized, even if he also does not flee.

In concluding that Johnson did not attempt to flee, the district court determined: (1) that Johnson did not speed up when the police activated their lights, (2) that he did indeed roll through the second stop sign while making a right-hand turn, and (3) that he then stopped at the BP gas station a short distance away. These facts do not support the conclusion that Johnson objectively submitted to police authority before running the second stop sign. In short, Johnson could have stopped earlier than he did, and until he actually pulled into the gas station his actions were consistent with someone who intended to continue driving rather than stop.

From Johnson's perspective, the short distance between where the police activated their lights and the gas station is of critical importance. Johnson acknowledges that he drove about one-third of a long block—several hundred feet, according to maps in the record—after the police activated their lights in order to reach the stop sign at Wisner and Myrtle. Johnson argues that he reasonably concluded the safest place to pull over was the nearby gas station, and that because he stopped as soon as was reasonably possible he therefore was seized from the moment the police activated their lights. He relies primarily on *United States v. Randolph,* 131 Fed.Appx. 459, 462 (6th Cir.2005), where we said that "it is possible that a person driving a vehicle may be considered seized before he comes to a complete stop" if he "submit[s] to the officer's show of authority by, for instance, pulling over to stop as soon as reasonably possible."

But there is no indication that Johnson could not have safely stopped his car before reaching the stop sign at Wisner and Myrtle. No testimony suggested that it would have been physically impossible for Johnson to come to a complete stop before reaching the intersection. And the lack of any other cars on Wisner suggests there were no traffic conditions that made it unsafe or impracticable to stop sooner, Johnson's purported concerns about potential police misconduct notwithstanding. Thus, although Johnson stopped relatively soon after the police activated their lights, he clearly did not stop as soon as was "reasonably possible" under the circumstances. *Cf., e.g., Watkins v. City of Southfield,* 221 F.3d 883, 885 (6th Cir.2000) (suspect motorist not seized when he continued driving for one or two blocks after the police activated their lights before eventually pulling into a gas station and stopping).

Furthermore, the fact that Johnson drove through the second stop sign without actually stopping is itself problematic. Failing to obey a traffic signal can constitute evasive behavior indicating that the driver has not submitted to police authority. *See, e.g., United States v. Griffin*, 652 F.3d 793, 796, 801 (7th Cir.2011) (defendant ran a red light, along with other evasive driving). Johnson's activation of his blinker is also consistent with the standard protocol for someone who intends to make a turn and continue driving. It does not necessarily signify that the driver is turning or stopping in response to the officers' show of authority, even if that is what the driver does, in fact, intend to do. Again, submission is determined based on an objective, not subjective standard. Whether Johnson actually intended to stop is irrelevant. Johnson's failure to stop on Wisner or at the stop sign simply would not suggest to a reasonable observer that Johnson was submitting to the officers' authority.

Finally, there is the issue of Johnson's speed. Slowing down could have signaled that Johnson was beginning the process of stopping and, thus, had changed his driving in response to the officers' show of authority. Here, the district court found only that Johnson did not accelerate in an attempt to flee. But even assuming Johnson did slow down as he continued down Wisner, that conduct would be equally consistent with the actions of a driver who intends to evade law enforcement. As such, it does not objectively demonstrate Johnson's submission to police authority.

Based on all the facts and circumstances, we ultimately conclude that Johnson did not objectively indicate his submission to authority prior to running the second stop sign. Accordingly, Johnson was not seized for Fourth Amendment purposes prior to running the second stop sign. The police could properly rely on this traffic infraction to justify the stop. Thus, the police did not violate the Fourth Amendment by stopping Johnson, and the gun found in Johnson's car should not have been suppressed.

### III. Conclusion

For the foregoing reasons, we reverse the district court's order suppressing the firearm found in Johnson's car and remand for further proceedings consistent with this opinion.

