RECOMMENDED FOR FULL-TEXT PUBLICATION
Pursuant to Sixth Circuit I.O.P. 32.1(b)

File Name: 19a0171p.06

# UNITED STATES COURT OF APPEALS

## FOR THE SIXTH CIRCUIT

―――――――――

LONNIE LEE OWENS,

*Petitioner-Appellee*,

*v.*

MIKE PARRIS, Warden,

*Respondent-Appellant*.

No. 17-5488

―――――――――

Appeal from the United States District Court
for the Eastern District of Tennessee at Winchester.
No. 4:14-cv-00018—Harry S. Mattice, Jr., District Judge.

Argued: March 20, 2019

Decided and Filed: July 30, 2019

Before: McKEAGUE, KETHLEDGE, and THAPAR, Circuit Judges.

―――――――――

## COUNSEL

―――――――――

**ARGUED:** Richard D. Douglas, OFFICE OF THE TENNESSEE ATTORNEY GENERAL, Nashville, Tennessee, for Appellant. Kasdin M. Mitchell, KIRKLAND & ELLIS LLP, Washington, D.C., for Appellee. **ON BRIEF:** Richard D. Douglas, OFFICE OF THE TENNESSEE ATTORNEY GENERAL, Nashville, Tennessee, for Appellant. Kasdin M. Mitchell, KIRKLAND & ELLIS LLP, Washington, D.C., for Appellee. Lonnie Lee Owens, Tiptonville, Tennessee, pro se.

―――――――――

## OPINION

―――――――――

KETHLEDGE, Circuit Judge. Lonnie Lee Owens covered his estranged wife's nose and mouth with duct tape, hogtied her arms and legs behind her back, and left her alone in a shed to

die.  A Tennessee jury convicted Owens of second-degree murder.  The trial judge increased Owens's sentence based in part on the judge's finding that a sentencing enhancement was warranted for "exceptional cruelty."  Owens now seeks federal habeas relief, arguing that the Sixth Amendment required the jury, rather than the judge, to make that finding.  The district court agreed and granted the writ.  We hold that the state court's error was harmless, and reverse.

I.

Owens and his wife Heather separated in September 2002 and agreed to share custody of their two young children.  Soon thereafter, Owens screamed at Heather that, if she took their children away from him, he would kill her.  Owens also told one of his friends that he had made the same threat.

On May 17, 2003, Owens was at his house with the children while Heather was at work.  Late that morning, Owens called Heather to ask when she would pick up the children, telling her that he had plans that evening.  According to Owens, Heather hung up on him without saying when she planned to come over.  Owens then called his girlfriend, Kara, and said that he was not sure when Heather would come to get the kids.  Kara agreed not to go over to his house to avoid running into Heather.  Around 3:00 p.m., Heather left work and drove her truck to Owens's house, where the children were napping and Owens was doing laundry.  Owens says he was startled when a person appeared behind him and said "F-you."  He swung at the person with all his strength.  Only after he struck the person in the head, Owens claims, did he realize it was Heather.

Owens says he checked for Heather's pulse and thought she was dead.  He bound her arms and legs with duct tape, hogtying her limbs together behind her back—all, according to Owens, to make it easier to move her dead body.  He also wrapped tape around the bottom half of her head, covering her nose and mouth—because, according to Owens, her face was turning gray and he did not want to look at her.  Then he dragged Heather to a shed behind his house and left her inside.

Around 4:00 p.m., Owens drove Heather's truck to a nearby parking lot, abandoned it with her keys inside, and ran back to his house.  (His movements were filmed by a video camera

across the street from the parking lot.)  Owens then made a series of phone calls.  First, Owens called Kara to ask her to come over.  Then he called a friend to say that Owens and Kara planned to attend the friend's party that evening.  Finally, he called Heather's cell phone and left a voicemail, asking her whether she planned to pick up the kids and saying "I love you" and "[t]ake care."

Soon thereafter, Kara arrived at Owens's house.  According to Kara, Owens was "pacing back and forth," "sweating," and "seemed to be nervous and upset."  He told her that some of his friends had stolen Heather's truck as a joke, and he convinced Kara to help him to move the truck to another town.  Then he and Kara went to the party.  After they returned home, Owens asked Kara to watch the children while he went fishing.  Instead, however, Owens drove Heather's body to a nearby lake and buried her in a shallow grave on an island, where the police found Heather's body more than two weeks later.

A Tennessee jury thereafter convicted Owens of second-degree murder.  At the time of his sentencing, Tennessee law prescribed sentencing ranges based on the category of the offense and the defendant's prior convictions.  *See* Tenn. Code Ann. § 40-35-112 (2004).  Within these ranges, the law further prescribed presumptive sentences from which the sentencing judge could depart only if the judge found certain aggravating or mitigating factors.  *See id.* § 40-35-210(c) (2005).

Owens faced a minimum sentence of 15 years and a maximum of 25 years for his second-degree murder conviction.  *See id.* §§ 39-13-210(c)(1), 40-35-112(a)(1) (2005).  His presumptive sentence within that range was 20 years.  *See id.* § 40-35-210(c) (2005).  Over Owens's objection, the sentencing judge found that two enhancements applied, including one for "exceptional cruelty."  *See id.* § 40-35-114(5) (2005).  Those enhancements allowed the trial judge to increase Owens's sentence to 25 years.  The Tennessee Court of Criminal Appeals thereafter affirmed the application of the exceptional-cruelty enhancement, but reversed the application of the other enhancement.  *See State v. Owens*, No. M2005-00362-CCA-R3-CD, 2005 WL 2653973, at *8 (Tenn. Crim. App. Oct. 18, 2005).  The court thus reduced Owens's sentence to 24 years.

Owens thereafter sought federal habeas relief, arguing among other things that his sentence was increased, in violation of the Sixth Amendment, based on facts found by the judge rather than the jury. The district court granted the writ. This appeal followed.

## II.

We review the district court's decision de novo. *See Mendoza v. Berghuis*, 544 F.3d 650, 652 (6th Cir. 2008). The Tennessee Court of Criminal Appeals adjudicated Owens's Sixth Amendment claim on the merits, which means Owens must show that the court reached a decision that was "contrary to, or involved an unreasonable application of" clearly established Supreme Court precedent. *See* 28 U.S.C. § 2254(d)(1).

## A.

In the district court, the State did not even dispute that the state court had unreasonably applied Supreme Court precedent when the court rejected Owens's Sixth Amendment claim. Owens therefore says the State has forfeited its argument here that the state court's decision was not "unreasonable" as that term is used in § 2254(d)(1). Yet the district court decided that issue on the merits, which means the State can challenge that holding now. *See United States v. Clariot*, 655 F.3d 550, 556 (6th Cir. 2011).

So we turn to question whether the Tennessee Court of Criminal Appeals unreasonably applied Supreme Court precedent when it rejected Owens's Sixth Amendment claim. Two precedents are especially important here. The first is *Apprendi v. New Jersey*, 530 U.S. 466, 490 (2000), where the Court held that, "[o]ther than the fact of a prior conviction, any fact that increases the penalty for a crime beyond the prescribed statutory maximum must be submitted to a jury, and proved beyond a reasonable doubt." The second is *Blakely v. Washington*, 542 U.S. 296, 303 (2004), where the Court made clear that "the 'statutory maximum' for *Apprendi* purposes is the maximum sentence a judge may impose *solely on the basis of the facts reflected in the jury verdict or admitted by the defendant*." (Emphasis in original.) Yet the Tennessee court regarded the statutory maximum for purposes of Owens's sentencing as the generic 25-year maximum for second-degree murder, rather than the 20-year maximum that the judge could impose based solely on the facts reflected in the verdict or admitted in Owens's case.

*See Owens*, 2005 WL 2653973, at *6 (citing *State v. Gomez*, 163 S.W.3d 632, 661 (Tenn. 2005)).   That decision was inconsistent with *Blakely*'s plain terms.   *Accord Portalatin v. Graham*, 624 F.3d 69, 83-84 (2nd Cir. 2010); *Butler v. Curry*, 528 F.3d 624, 636 (9th Cir. 2008).

Yet the state argues that the issue was not so clear-cut in Owens's case, because the judge's finding of "exceptional cruelty" merely permitted, rather than mandated, a sentence above 20 years.   But in *Blakely* the sentencing judge had the same discretion not to impose a higher sentencing based on the judge's own factfinding.   And in *Blakely* the Supreme Court specifically instructed that, "[w]hether the judicially determined facts *require* a sentence enhancement or merely *allow* it," a sentence violates the Sixth Amendment when "the verdict alone does not authorize the sentence." *Blakely*, 542 U.S. at 305 n.8 (emphasis in original).   The Supreme Court could hardly have been clearer; and here the verdict alone did not authorize Owens's sentence.   The Tennessee court's application (or refusal to apply) *Blakely* was therefore unreasonable.

B.

But Owens is entitled to habeas relief only if the state court's error was not harmless.   *See Washington v. Recuenco*, 548 U.S. 212, 221-22 (2006).   On habeas review, an error is harmful only if it had a "substantial and injurious effect" upon Owens's sentence, or if we have "grave doubt" as to whether the error had such an effect.   *See O'Neal v. McAninch*, 513 U.S. 432, 435 (1995).

Owens states that, as to harmlessness, "[t]he only question is whether the jury would have found that Owens acted with exceptional cruelty if that question had been submitted to it."   Br. at 36.   We agree with that statement of the relevant question here.   In *Washington v. Recuenco*, the Court observed that "[a]ny possible distinction between an 'element' of a felony offense and a 'sentencing factor' was unknown to the practice of criminal indictment, trial by jury, and judgment by court as it existed during the years surrounding our Nation's founding."   548 U.S. at 220 (quoting *Apprendi*, 530 U.S. at 478).   Thus, the Court held, "elements and sentencing factors must be treated the same for Sixth Amendment purposes." *Id.*   In *Recuenco*, that equality of treatment meant that "[f]ailure to submit a sentencing factor to the jury, like failure to submit an

element to the jury, is not structural error." *Id*. at 222. Here, that equality means that, for either "failure," we ask the same question to determine harmlessness: namely, "whether the jury would have returned the same verdict absent the error[.]" *Id*. at 221; *accord Butler*, 528 F.3d at 648.

That question is the dispositive one, we hold, even though in two other cases we asked whether the sentencing judge would have imposed the same sentence absent the *Blakely* error. But in the first of those cases, we simply rejected on its terms the Warden's argument that the sentencing judge would have "undoubtedly impose[d] the same sentence on remand." *Villagarcia v. Warden*, 599 F.3d 529, 537 (6th Cir. 2010). We notably did not address the antecedent question whether the Warden had asked the right question in the first place. And in the second case our discussion of what the sentencing judge might have done on remand was plainly dictum—because the "State did not argue harmless error before the district court and did not argue it in [its] briefing [on] appeal[,]" and thus had "waived" the issue. *Lovins v. Parker*, 712 F.3d 283, 303-04 (6th Cir. 2013). Moreover, the question whether the court would have imposed the same sentence on remand is itself incoherent in cases where—as here—the court's factfinding *liberated* the court to impose the sentence that the court in fact imposed, rather than mandated that sentence. What is missing in all these cases—as to elements and sentencing factors alike—is a jury finding, not a judicial one. Hence the question as to harmlessness is whether the jury would have made the necessary finding had the jury been asked to make it.

Under Tennessee law at the time of Owens's trial, the sentencing factor at issue—namely, an enhancement for "exceptional cruelty"—required a finding that the defendant inflicted "pain or suffering for its own sake or from the gratification derived therefrom," and not simply "pain and suffering inflicted as the means of accomplishing the crime charged." Tenn. Code Ann. § 40-35-114(5); *State v. Arnett*, 49 S.W.3d 250, 258 (Tenn. 2001). On this record, whether Owens's jury would have made that finding depends on whether they thought Heather was still alive when Owens duct-taped her mouth and nose—leaving her eyes uncovered—and then dragged her to the shed and left her there. Owens's testimony, as described above, was that Heather suddenly materialized behind him, that he punched her without realizing whom he was punching, and that she died more or less immediately after the punch. Owens further testified

that he hogtied Heather not to restrain her, but (inexplicably, one might say) to move her body more easily; and that he duct-taped her airways not to suffocate her, but to cover her face, which distressed him because it was turning gray—a sensitivity notably absent the remainder of that day, as he moved Heather's truck, left her a voicemail (as she lay dead or dying in the shed), partied with Kara, and buried Heather in a shallow grave, among other activities. The State's theory, in contrast, was more simple: that Heather had suffocated from the duct tape that Owens placed over her nose and mouth.

The judgment we need to make here is whether there is any substantial likelihood that the jury believed Owens's testimony—in which case his actions after the punch presumably were not cruel because Heather was no longer alive to suffer from them. For the moment we set to one side what seems to us the patently fantastic nature of Owens's testimony. What plagues Owens's theory from the start, rather, is that the jury did in fact convict him of second-degree murder. And that means the jury found that Owens killed Heather knowingly. *See* Tenn. Code Ann. § 39-13-210(a)(1); *State v. Ducker*, 27 S.W.3d 889, 896 (Tenn. 2000). Thus, for the jury to have believed Owens's testimony *and* to have convicted him nonetheless of second-degree murder*,* the jury must have thought that, when Owens punched Heather (without knowing who she was, no less), he was reasonably certain that the punch would kill her. Nothing in the record or in common sense supports that hypothesis. Moreover, the State's medical examiner testified that Heather's body bore no signs of blunt force trauma, and that her cause of death was asphyxiation. Add in the other fantastic aspects of Owens's testimony, and one doubts that any sentient juror would have believed any of it. Suffice it to say that we are confident that the jury rejected Owens's account of the murder and accepted the State's.

But that leaves the question whether the jury, if asked, would have found that Owens acted with exceptional cruelty. The duct-taping cannot support that finding, because it was "the means of accomplishing the crime charged." *Arnett*, 49 S.W.3d at 258. But other circumstances strongly support a finding of exceptional cruelty. Owens did not simply suffocate Heather; he left her alone in a shed, struggling to breathe with her limbs bound behind her back and her children nearby in the house. Those actions amount to "psychological abuse or torture," which supports a finding of exceptional cruelty. *See id*. Moreover, Owens's actions after duct-taping

Heather and leaving her to die—*e.g.*, partying with his girlfriend and later burying Heather's body in a shallow grave—reflect his "calculated indifference toward [her] suffering," which likewise supports the necessary finding. *See State v. Reid*, 91 S.W.3d 247, 311 (Tenn. 2002).

We have little doubt that, if asked, the jury would have made the requisite finding. The *Blakely* error was therefore harmless.

\*   \*   \*   \*   \*

The district court's judgment is reversed, and the case is remanded with instructions to deny the petition.