RECOMMENDED FOR PUBLICATION
Pursuant to Sixth Circuit I.O.P. 32.1(b)

File Name: 24a0262p.06

# UNITED STATES COURT OF APPEALS

## FOR THE SIXTH CIRCUIT

─────────────────

DELANO HALE,

        *Petitioner-Appellant*,

    *v.*

BILL COOL, Warden,

        *Respondent-Appellee*.

No. 22-3265

─────────────────

Appeal from the United States District Court for the Northern District of Ohio at Cleveland.
No. 1:18-cv-00504—Sara E. Lioi, District Judge.

Argued: July 17, 2024

Decided and Filed: November 27, 2024

Before: BOGGS, NALBANDIAN, and READLER, Circuit Judges.

─────────────────

**COUNSEL**

─────────────────

**ARGUED:** Jordan S. Berman, OFFICE OF THE FEDERAL PUBLIC DEFENDER FOR THE SOUTHERN DISTRICT OF OHIO, Columbus, Ohio, for Appellant. Brenda S. Leikala, OFFICE OF THE OHIO ATTORNEY GENERAL, Columbus, Ohio, for Appellee. **ON BRIEF:** Jordan S. Berman, Lisa M. Lagos, OFFICE OF THE FEDERAL PUBLIC DEFENDER FOR THE SOUTHERN DISTRICT OF OHIO, Columbus, Ohio, for Appellant. Brenda S. Leikala, OFFICE OF THE OHIO ATTORNEY GENERAL, Columbus, Ohio, for Appellee.

─────────────────

**OPINION**

─────────────────

BOGGS, Circuit Judge. In 2005, an Ohio court sentenced Delano Hale to death for the murder of Douglas Green. The Ohio Supreme Court and Ohio Court of Appeals both affirmed

his conviction. Hale now petitions this court for a writ of habeas corpus, relying on two different grounds for relief. For the following reasons, we deny Hale's petition and affirm the judgment of the district court below.

## I. BACKGROUND

*A. Facts*

On June 23, 2004, an employee of the Lake Erie Lodge in Euclid, Ohio entered Room 231 of the motel and discovered Douglas Green's corpse inside, wrapped in plastic garbage bags. Green, a local voice teacher, singer, and record producer, had been shot four times in the right side of his head and left inside the vacant room.

Five days later, Ohio police found and arrested Delano Hale inside Green's stolen Ford Explorer SUV. One of Hale's friends would later testify he had seen Hale driving the car around town for the previous few days. Additionally, the day before Green's body was discovered, a person used Green's Visa card at a Giant Eagle grocery store to buy garbage bags, cleaning supplies, beer, and cigarettes. The purchaser also used a Giant Eagle discount card registered to Hale's sister and deceased mother.

Shortly after being taken to the police station, Hale wrote and signed a four-page statement. In his statement, Hale admitted shooting Green. However, Hale wrote, this killing was a reaction to Green's nonconsensual sexual advances. According to Hale, Green had represented himself as a record producer, asked Hale if he had ever considered singing professionally, and accepted Hale's invitation back to Hale's room at the Lake Erie Lodge so that Hale could sing for him. Purportedly, Green was carrying a small gun with him, which he showed to Hale.

Hale claimed that he sang for Green, went to the bathroom, and returned, only to find that Green had undressed and was lying on the bed naked. Green purportedly then approached Hale, grabbed Hale's hands, and began to make slurping noises near Hale's crotch. Hale related that he managed to free his right hand, grab Green's gun from Green's bag, aim it at Green, and cock it, but Green did not stop. Hale then claimed to have fired two times at Green. According to

Hale, he then backed away, reloaded the gun with bullets from Green's bag and fired several more times when Green continued moving. Hale claimed that, in light of his prior criminal record, he feared being implicated in the killing. He therefore did not call an ambulance, instead opting to dispose of the gun and Green's belongings, before eventually wrapping Green's body in trash bags and moving it to the motel's vacant room.

## B. Procedural History

Hale was charged with two counts of aggravated murder, under Ohio Rev. Code. § 2903.01(A) (premeditated killing) and § 2903.01(B) (killing during the commission of an aggravated robbery). Both aggravated-murder counts carried capital specifications. Additionally, Hale was charged with several noncapital crimes, including aggravated robbery, evidence tampering, escape, and having a weapon under disability. Hale pleaded not guilty to all charges.

At Hale's trial in 2005, the state advanced its own competing narrative of Green's killing, which directly clashed with Hale's theory of self-defense. Relying on forensic evidence, the state argued that Hale instead killed Green in a premeditated execution-style slaying, most likely in order to rob him. Because Hale did not dispute that he had killed Green (instead merely disputing his motive for doing so), Hale's lawyers did not call a competing forensic expert; rather, they relied on other evidence (including Green's past sexual misconduct) in an attempt to establish Hale and Green's respective characters, and to prove that Hale's account of self-defense in the face of unwanted sexual advances was more plausible than the state's premeditation theory.

The jury returned a guilty verdict on all charges and recommended that Hale be sentenced to death. The trial court accepted this recommendation and sentenced Hale to death for aggravated murder. The court also sentenced Hale to consecutive prison sentences of ten years for aggravated robbery (with three years added due to a firearms specification); eight years for escape; and five years each for tampering with evidence and using a weapon under disability.

After trial, Hale appealed his convictions directly to the Ohio Supreme Court, raising twenty-two distinct arguments. In 2008, the court affirmed Hale's convictions in full, denied his

motion to remand for re-sentencing, and denied Hale's motion for reconsideration of judgment. *State v. Hale*, 892 N.E.2d 864 (Ohio 2008); *State v. Hale*, 893 N.E.2d 519 (Ohio 2008) (table decision). While his direct appeal was pending, Hale also petitioned for post-conviction relief at the trial court, raising nineteen grounds for relief. After four years, the trial court denied his petition, which Hale then appealed to Ohio's Eighth District Court of Appeals. Eventually, in 2016, the appellate court affirmed the trial court below on all grounds and declined Hale's request to reconsider the judgment. *State v. Hale*, No. 103654, 2016 WL 4978449 (Ohio Ct. App. Sep. 15, 2016).

Finally, Hale timely began federal habeas proceedings in 2018. The district court appointed counsel for Hale and allowed him to proceed *in forma pauperis*. Hale would ultimately raise twenty-seven grounds for relief at the district court; the district court denied each one in turn. *Hale v. Shoop*, No. 1:18-cv-504, 2021 WL 1215793 (N.D. Ohio Mar. 31, 2021). Hale then petitioned this court for a certificate of appealability, which we granted for two of his claims: (1) that Hale received ineffective assistance of counsel when his lawyers failed to call a forensic expert at trial; and (2) that Hale's noncapital sentences violated federal law as established by the Supreme Court in *Blakely v. Washington*, 542 U.S. 296 (2004).

## II.  STANDARD OF REVIEW

When a district court declines to issue a writ of habeas corpus, we review that decision de novo. *Foust v. Houk*, 655 F.3d 524, 533 (6th Cir. 2011). And like the district court, our ability to disturb final state-court convictions is tightly constrained by 28 U.S.C. § 2254, as amended by the Antiterrorism and Effective Death Penalty Act of 1996 (AEDPA). AEDPA permits issuance of a habeas writ under only two "narrow circumstances" when a state court has already ruled on the merits of the habeas petitioner's claim. *Brown v. Davenport*, 596 U.S. 118, 125 (2022).

The first of these circumstances is when a state court's ruling "resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States." 28 U.S.C. § 2254(d)(1). To satisfy the "contrary to" clause, Hale must show that "the state court 'arrive[d] at a conclusion opposite to that reached by [the Supreme Court] on a question of law,' or that it 'confront[ed] facts that are

materially indistinguishable from a relevant Supreme Court precedent and arrive[d] at a result opposite' to that reached by the Supreme Court." *Johnson v. Genovese*, 924 F.3d 929, 934 (6th Cir. 2019) (alterations in original) (quoting *Williams v. Taylor*, 529 U.S. 362, 405 (2000)). To satisfy the "unreasonable application" clause, Hale would similarly need to show that the state court "correctly identifie[d] the governing legal rule but applie[d] it unreasonably" to the facts of his case. *Williams v. Taylor*, 529 U.S. at 412.

The second circumstance in which we do not defer to a state-court merits ruling is when that ruling "was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding." 28 U.S.C. § 2254(d)(2). Where, as here, the district court relies solely on the state-court record, we review its factual findings de novo. *Barton v. Warden, S. Ohio Corr. Facility*, 786 F.3d 450, 460 (6th Cir. 2015).

Under either circumstance, habeas petitioners seeking to satisfy Section 2254's standards face a task intentionally designed to be difficult. *Davis v. Jenkins*, 115 F.4th 545, 553 (2024) (citing *Harrington v. Richter*, 562 U.S. 86, 102 (2011)). "[W]here there is no possibility fairminded jurists could disagree that the state court's decision conflicts with this Court's precedents," issuance of the writ of habeas under § 2254(d)(1) is appropriate; where petitioners seek mere "ordinary error correction," it is not. *Harrington*, 562 U.S. at 102. To prevail under § 2254(d)(2), the petitioner must first show that the underlying facts were not just debatable or incorrect but "unreasonable—'a substantially higher threshold'" for obtaining relief. *Shoop v. Twyford*, 596 U.S. 811, 819 (2022) (quoting *Schriro v. Landrigan*, 550 U.S. 465, 473 (2007)). And then the petitioner must show that the unreasonable factual determination was a but-for cause of the state court's "decision." *Rice v. White*, 660 F.3d 242, 250 (6th Cir. 2011). The inherently intrusive nature of federal habeas review mandates such restraint, as issuance of the writ "frustrates 'both the States' sovereign power to punish offenders and their good-faith attempts to honor constitutional rights.'" *Calderon v. Thompson*, 523 U.S. 538, 555–56 (1998) (quoting *Murray v. Carrier*, 477 U.S. 478, 487 (1986)).

## III.  HALE'S FIRST CLAIM: INEFFECTIVE ASSISTANCE OF COUNSEL

Hale's first ground for relief on appeal is that his trial counsel performed deficiently, prejudicing Hale and violating his Sixth Amendment right to effective counsel under *Strickland v. Washington*, 466 U.S. 668 (1984).  Specifically, Hale alleges that his state trial counsel was ineffective for failing to counter the state's forensic experts with a forensic expert of Hale's own.

### A.  Procedural Default

The procedural-default doctrine bars federal courts from habeas claims that were either: (1) not timely pursued on state appeal; or (2) waived due to failure to comply with state procedural rules.  *Williams v. Anderson*, 460 F.3d 789, 806 (6th Cir. 2006).  But as the district court noted, Hale fully pursued this specific ineffective-assistance-of-counsel claim at the state level.  And the Ohio Court of Appeals issued a full merits ruling on the issue in 2016, stating that Hale's trial counsel was not ineffective for failure to hire a "crime scene expert."  *State v. Hale*, No. 103654, 2016 WL 4978449, at \*6 (Ohio Ct. App. Sep. 15, 2016); *Hale v. Shoop*, No. 1:18-cv-504, 2021 WL 1215793, at \*96 (N.D. Ohio Mar. 31, 2021).  We are confident that Hale's first claim—that his counsel's failure to hire a forensic expert was constitutionally ineffective assistance—is therefore ripe for habeas review, and not procedurally defaulted.[1]

### B.  *Combining* Strickland *and AEDPA*

When bringing a *Strickland* claim, a defendant bears the burden of showing that his counsel's performance was deficient, and that this deficiency prejudiced the defense.  *Strickland*, 466 U.S. at 687.  Counsel's performance was deficient if it "fell below an objective standard of reasonableness," as defined by "prevailing professional norms."  *Strickland*, 466 U.S. at 688.  And deficiency gives rise to prejudice if there was a "reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different."  *Id*. at

---

[1]The district-court opinion stated that Hale had procedurally defaulted several other ineffective-assistance claims, such as those based on counsel's failure to hire "a forensic psychiatrist, forensic pathologist, bloodstain pattern expert, and sexual abuse and trauma expert."  *Hale v. Shoop*, 2021 WL 1215793, at \*96.  In granting a certificate of appealability, we framed the question as "whether trial counsel was ineffective for failing to conduct a reasonable *forensic investigation*."  And Hale refers to his own proffered expert, Dr. Rini, as a forensic science consultant, rather than as one of the procedurally defaulted categories of experts, such as a bloodstain-pattern expert.

694. To succeed, defendants must satisfy both standards; failure to succeed in either task will defeat their entire claim. *See Wong v. Belmontes*, 558 U.S. 15, 27 (2009).

Even under ordinary circumstances, defendants face an uphill battle in bringing a *Strickland* claim that hinges on a purported failure to call expert witnesses. *Dunn v. Reeves*, 594 U.S. 731, 739 (2021) (per curiam). "[S]trategic decisions—including whether to hire an expert—are entitled to a 'strong presumption' of reasonableness." *Ibid.* (quoting *Harrington*, 562 U.S. at 104). And while defense counsel has a "duty to make reasonable investigations or to make a reasonable decision that makes particular investigations unnecessary," those investigations are themselves retrospectively reviewed with a "heavy measure of deference to counsel's judgments." *Strickland*, 466 U.S. at 691.

Under AEDPA, our review of ineffective-assistance-of-counsel claims becomes "doubly deferential." *Knowles v. Mirzayance*, 556 U.S. 111, 123 (2009). This is the result of our "apply[ing] the highly deferential AEDPA standard to the already deferential *Strickland* standard." *Rogers v. Mays*, 69 F.4th 381, 389 (6th Cir. 2023) (en banc) (citing *Cullen v. Pinholster*, 563 U.S. 170, 190 (2011)). In a case like Hale's, "[w]hen § 2254(d) applies, the question is not whether counsel's actions were reasonable. The question is whether there is *any* reasonable argument that counsel satisfied *Strickland*'s deferential standard." *Harrington*, 562 U.S. at 105 (emphasis added). Put differently, "it is no longer enough for [Hale] to show that his attorneys made a decision that no reasonable lawyer would have made. He now must show that '*every* "fairminded juris[t]" would agree that *every* reasonable lawyer would have made a different decision.'" *Fields v. Jordan*, 86 F.4th 218, 240 (6th Cir. 2023) (en banc) (quoting *Reeves*, 594 U.S. at 739–40).

## C. Performance or Prejudice?

As a preliminary matter, Hale argues that AEDPA should not govern all of our review of the state court's adjudication. The parties agree that the state court ruled on Hale's ineffective-assistance claim on the merits. But the state court did not clearly state which part of *Strickland* it relied on to deny Hale's claim. And under our precedent, if the state court "relied only on one *Strickland* prong to adjudicate an ineffective assistance of counsel claim, AEDPA deference does

not apply to review of the *Strickland* prong not relied upon by the state court"; that portion instead receives de novo review. *Rayner v. Mills*, 685 F.3d 631, 638 (6th Cir. 2012).

In providing the last reasoned state-court decision denying Hale's claim on the merits, the Ohio state appellate court determined that the forensic evidence at trial did not support Hale's claim, and that Hale's proposed expert did not help his cause. *State v. Hale*, No. 103654, 2016 WL 4978449, at *7 (Ohio Ct. App. Sep. 15, 2016). But it rejected the claim without explicit reference to a particular part of *Strickland*, concluding that "because Rini's expert report does not refute the state's evidence, counsel was not ineffective for failing to retain him . . . ." *Ibid*. The finding that Hale's desired expert could not have refuted the state's evidence could support a holding either: (1) that Hale's counsel was not ineffective even though he chose not to present certain evidence (deficient performance); or (2) that counsel was not ineffective because even somewhat helpful evidence would not have affected the trial's outcome (prejudice). Moreover, the state court recited legal standards for both the performance and prejudice portions of *Strickland* before beginning its analysis. *Id.* at *2.

Although it is not entirely clear which part of *Strickland* the Ohio Court of Appeals relied on, the court's language, at the very least, captured the "performance" portion of *Strickland*. For that reason, we should afford AEDPA deference in reviewing the "performance" analysis. And because we find that Hale has not successfully carried his burden as to deficient performance, we are able to resolve this case without reaching the prejudice issue or considering whether the state court addressed it. *See Strickland*, 466 at 700 (instructing that failure to make the required showing on either point defeats the entire claim).[2]

## D. Analysis

To begin our analysis, Hale largely does not engage with the state court's performance decision on § 2254(d)(1) grounds. The Court of Appeals of Ohio correctly stated *Strickland*'s

---

[2]Arguably, we could apply AEDPA deference to *both* prongs of *Strickland* in this instance. Because the Court of Appeals of Ohio's holding on the *Strickland* issue was so brief, it is somewhat close in spirit to a "summary holding," in which it is unclear "whether the holding was based on deficiency or prejudice or both." *Rayner*, 685 F.3d at 638. And when confronted with such an ambiguity, it "makes sense under *Harrington* for a habeas court to review both prongs pursuant to AEDPA to assure proper deference to the unspoken holding(s) actually relied upon by the state court." *Ibid.*

deficient-performance standard when it wrote that "[c]ounsel will only be considered deficient if his or her conduct fell below an objective standard of reasonableness," then further expounded that this was a highly deferential standard. *State v. Hale*, 2016 WL 4978449, at *2; *see Strickland*, 466 U.S. at 688–89. Moreover, Hale's situation does not involve facts materially identical to *Strickland*, a case that did not concern defense counsel's failure to employ a forensic witness. *See* 466 U.S. at 675. Accordingly, there is no legitimate argument that the state court's performance decision was "contrary to" clearly established Supreme Court precedent. 28 U.S.C. § 2254(d)(1); *see Williams v. Taylor,* 529 U.S. 362, 405 (2000). Nor does Hale appear to argue that the state court's decision is an "unreasonable application" of clearly established law to the facts under § 2254(d)(1). *See Rogers*, 69 F.4th at 389.

Rather, the substance of Hale's argument is that the state court's finding of deficient performance did not obey § 2254(d)(2), because the court's ineffective-assistance decision "was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding." We reiterate here that, even if we were conducting de novo review, "the standard for judging counsel's representation is a most deferential one." *Harrington*, 562 U.S. at 105. But under AEDPA, Hale "must do more than convince us that we would have reached a different conclusion in the first instance." *Fields*, 86 F.4th at 240–41 (citing *Burt v. Titlow*, 571 U.S. 12, 18 (2013)). It is not enough for Hale to show that the state court was incorrect in its *Strickland* findings; he must instead clear the "substantially higher threshold" of demonstrating that the state court was "unreasonable." *Id.* at 240 (quoting *Shoop v. Twyford*, 596 U.S. 811, 819 (2023)). And since we hold that the state court's findings were (at minimum) reasonable, Hale ultimately fails to meet this requirement.

The crux of Hale's claim is that his trial counsel performed deficiently by failing to employ a forensic expert, who could have then countered the state's own forensic witnesses. In Hale's telling, this failure was a product of his counsel's sheer incompetence, rather than an unsuccessful trial strategy. And to be sure, the state's forensic witnesses were devastating to Hale's case. At trial, Hale's counsel employed a nuanced strategy, conceding that Hale was Green's killer while arguing (based on an assortment of other evidence) that this killing was self-defense or committed with a less culpable state of mind than required for aggravated murder.

The state's forensic experts, however, challenged this theory on several grounds. First, they demonstrated that, while Hale claimed to have drawn Green's gun with his right hand, then held it up to Green's head and fired while Green was directly facing him, the bullet entry wounds that killed Green were on the *right* side of Green's head; that is, the side of Green's head that would have been facing away from Hale, if Hale's account was true. *See State v. Hale*, 2016 WL 4978449, at *6. Gunshots on the right side of Green's head were fully consistent, however, with the state's execution-style theory of the killing. Second, the state highlighted Green's autopsy report, which revealed that the victim's own right hand was covered with gunshot residue. This suggested Green had raised that hand to protect himself when the shots were fired. *See ibid.* But again, Hale's story seemed to suggest that he shot Green on the *left* side of the latter's head, which the state argued was inconsistent with the residue falling on Green's right (rather than left) hand. And third, the state showed that a spot of Green's blood had fallen on the bed's headboard at the scene of the killing. This blood spatter indicated that Green was no more than three or four feet from the headboard at the time of the killing; yet in Hale's account, Green was sitting at the foot of the bed during their struggle. *See ibid*.

Ultimately, Hale's counsel's strategy was unsuccessful: although his lawyers requested and secured instructions on non-capital murder, manslaughter, and self-defense, the jury eventually convicted Hale on all counts and specifications and recommended a sentence of death. *Id.* at *1. In an affidavit filed as part of Hale's postconviction-relief materials, Jillian Davis, a member of Hale's trial team, reflected that "[w]e were not expecting the prosecution to attack [Hale's] statement by arguing the impossibility of the angle of the gunshots. If I had known this, I would have used a crime scene reconstructionist to refute the prosecution's claims."

In the "harsh light of hindsight," it is certainly true that Hale's counsel may have served him more effectively by employing a forensic expert. *Harrington*, 562 U.S. at 107 (quoting *Bell v. Cone*, 535 U.S. 685, 702 (2002)). But hindsight bias is the very thing that *Strickland*'s deferential standard counsels against: in assessing attorney performance after the fact, we must make "every effort . . . to eliminate the distorting effects of hindsight, to reconstruct the circumstances of counsel's challenge conduct, and to evaluate the conduct *from counsel's perspective at the time*." *Strickland*, 466 U.S. at 689 (emphasis added). And given *Strickland*'s

objective standard of reasonableness, the subjective, post-hoc views of trial counsel are simply not relevant considerations. *See Fields*, 86 F. 4th at 243. Under this proper rubric, then, failure by Hale's counsel to make even the most rudimentary investigation into the issue of forensics could constitute objectively unreasonable deficient performance. *See Harrington*, 562 U.S. at 106. But if Hale's counsel instead explored the option of calling a forensic expert, then consciously chose another trial strategy that later failed, such a decision would be difficult to fault without falling into the trap of hindsight bias. *See ibid.*

The trial record shows that, in fact, this is exactly what Hale's counsel did. Less than two months after Hale's indictment, Hale's counsel filed a motion for expert funding. Months later, they filed a second motion, this time requesting funding for a forensic expert. In subsequent hearings with the trial court, counsel continued to mention the motions, although they did not at the time predict they would rely on an expert. This behavior is consistent with the state court's determination that Hale's attorneys "ma[de] a reasonable decision that ma[de] particular investigations unnecessary." *Strickland,* 466 U.S. at 691. "From the perspective of . . . counsel . . . there were any number of hypothetical experts . . . whose insight might possibly have been useful. . . . Counsel was entitled to formulate a strategy that was reasonable at the time and to balance limited resources in accord with effective trial tactics and strategies." *Harrington*, 562 U.S. at 107 (citation omitted).

In this case, that strategy was to avoid engaging the state in a battle of forensic experts, and instead weave a sympathetic narrative, based on elements of Hale's character and behavior, that supported his theory of what occurred. These elements included Hale's behavior after the murder and willingness to give a candid statement to police, which counsel contended was not the behavior of a calculating killer; his history of suffering unwanted sexual advances in prison, which could have supported his theory of instinctual reaction to Green's alleged behavior; and Green's own criminal sexual history. Hale's counsel are hardly the first lawyers to weigh their options before deciding to avoid "the possibility that expert testimony could shift attention to esoteric matters of forensic science, distract the jury from whether [Hale] was telling the truth, or transform the case into a battle of the experts." *Harrington*, 562 U.S. at 108–09. Indeed, "counsel has a duty to make reasonable investigations *or to make a reasonable decision that*

*makes particular investigations unnecessary*." *Strickland*, 466 U.S. at 691 (emphasis added). On this factual record, we cannot say it was unreasonable for the state court to conclude that Hale's counsel simply selected the latter of these two options.

Even the affidavit of Jillian Davis, which Hale offered during postconviction proceedings as evidence of deficiency, seems to belie his argument. While discussing *other* choices the team made at trial (e.g., the decision not to question Hale's sister on certain topics), Davis openly admitted that these were "not the result of any strategic decision." But in stark contrast, when discussing the team's decision to not call a forensic expert, Davis made no such admission. Instead, though expressing regret at the lack of their strategy's *success*, she merely stated that the team would have chosen a *different* strategy in hindsight. "Even 'experienced' lawyers often second-guess themselves when a jury finds their client guilty." *Fields*, 86 F.4th at 243 (quoting *Harrington*, 562 U.S. at 109). And in a capital case like Hale's, it is even less surprising that his counsel might dwell on the outcome of the proceeding and regret a strategic decision that ultimately failed to pay off. But a strategic failure is not constitutional deficiency. And although Hale's counsel chose not to call an expert to battle with the prosecution's own forensic professional, "*Strickland* does not enact Newton's third law for the presentation of evidence, requiring for every prosecution expert an equal and opposite expert from the defense." *Harrington*, 562 U.S. at 111.

Finally, although we decide this case on performance (rather than prejudice) grounds, the district court's prejudice-focused analysis of Hale's proffered expert report is nonetheless helpful. Hale tenders the late Dr. Gary Rini, a forensic expert, as the kind of consultant his trial counsel could have hired to rebut the state's own forensic evidence. Both the Ohio Court of Appeals and the district court below rejected this argument on the grounds that Dr. Rini's report fails to rebut much of the state's evidence. *State v. Hale*, 2016 WL 4978449, at *6; *Hale v. Shoop*, 2021 WL 1215793, at *89–*90. For example, Dr. Rini attempted to justify the seeming inconsistency that, although Hale claimed to have been holding a gun righthanded near Green's head while directly facing Green, the bullet entry wounds were on the right side of Green's skull. Dr. Rini theorized that Green could have momentarily turned his head away from Hale, exposing the right side of his head, which Hale then shot. Based on this theory, Dr. Rini was also able to

offer a more favorable explanation of the blood-spatter evidence. However, as the district court noted, Dr. Rini's account failed to explain away the angle of the bullets, which traveled towards the back of Green's skull, rather than straight through (from right to left). Given this angle, Dr. Rini's hypothesis would only match Hale's story if Green inexplicably turned his head so it was facing virtually the other direction from Hale, all while simultaneously restraining Hale's arms and struggling with him, in an attempt to sexually assault him. Accordingly, both the Ohio Court of Appeals and district court found that Dr. Rini's account did not plausibly refute the state's theory of the shooting, or the related blood-spatter analysis.

In rejecting Dr. Rini's report, the district court then found that Hale was not prejudiced by counsel's failure to call a similar expert; the court's logic was that even if Dr. Rini had been called to testify at trial, there was no "'reasonable probability'" he would have altered the proceedings' outcome. *Hale v. Shoop*, 2021 WL 1215793, at *91 (quoting *Strickland*, 466 U.S. at 694). Although we are considering only *Strickland*'s performance portion, *see supra* at III.C, we note that the shortcomings of Dr. Rini's report may also cast a more favorable light on Hale's trial counsel's performance. In the words of the last reasoned state-court decision, "because Rini's expert report does not refute the state's evidence, counsel was not ineffective for failing to retain him." *State v. Hale*, 2016 WL 4978449, at *7. Put differently, even Hale's handpicked forensic expert Dr. Rini (who was selected with the benefit of post-trial hindsight) failed in multiple ways to refute the state's forensic evidence. This fact, in turn, makes it more likely that trial counsel's decision to cede the forensic battleground was not an utterly negligent oversight, but rather a reasoned decision (made after some preliminary investigation) to apply counsel's "limited resources" to other strategic pursuits. *Harrington*, 562 U.S. at 107.

We conclude our discussion of this issue by reiterating that our inquiry is a deferential one. The state court's ruling in this case is admittedly terse; but we do not have the authority to "flyspeck state-court opinions." *Rogers*, 69 F.4th at 391. Only where a decision is so contrary to clearly established federal law that it represents an "extreme malfunction[] in the state criminal justice system" is our deference under AEDPA overcome. *Davenport*, 596 U.S. at 133 (quoting *Brecht v. Abrahamson*, 507 U.S. 619, 634 (1993)). Here, "it was 'well within the bounds of a reasonable judicial determination for the state court to conclude that defense counsel

could follow a strategy that did not require the use of experts.'" *Kendrick v. Parris*, 989 F.3d 459, 472 (6th Cir. 2021) (quoting *Harrington*, 562 U.S. at 106–07).  Accordingly, we must deny Hale's first claim for relief.

## IV. HALE'S SECOND CLAIM: NONCAPITAL-SENTENCING ERROR

Hale's second claim on appeal is that he received heightened noncapital sentences based on facts not submitted to a jury, in violation of the Supreme Court's precedents in *Apprendi v. New Jersey*, 530 U.S. 466 (2000) and *Blakely v. Washington*, 542 U.S. 296 (2004).  In 2000, the Court's *Apprendi* decision established that most facts that increase a criminal defendant's punishment beyond the statutory maximum must be proved to a jury beyond a reasonable doubt. *Apprendi*, 530 U.S. at 477.  And in 2004, *Blakely* defined the term "statutory maximum" for *Apprendi* purposes as "the maximum sentence a judge may impose solely on the basis of the facts reflected in the jury verdict or admitted by the defendant."  542 U.S. at 303 (emphasis omitted).  Put together, *Apprendi* and *Blakely* generally forbade sentencing judges from conducting independent factfinding that could enhance a defendant's sentence beyond the maximum sentence supported by the facts in the jury verdict.

Despite these holdings, in 2005 (one year after *Blakely*), Hale received a heightened sentence for his noncapital charges based on facts that a jury never determined.  At sentencing, the state trial judge applied two statutes that conflicted with *Apprendi* and *Blakely*, Ohio Rev. Code §§ 2929.14(C) and (E)(4).  The former provision allowed judges to impose an enhanced sentence after finding that a defendant had committed "the worst form[]" of their convicted offense; the latter allowed judges to impose consecutive sentences after finding that "the offender was already under control of the court due to an earlier conviction." *State v. Foster*, 845 N.E.2d 470, 490–91 (Ohio 2006).  Under these statutes, the trial court found both that Hale had committed the worst form of each of his noncapital convictions (aggravated robbery, tampering with evidence, escape, and possessing a weapon while under disability), and that he was on parole at the time of the offense.  Accordingly, the court gave Hale an enhanced sentence for each offense, and set the aggravated robbery and escape sentences to run consecutively. Contrary to *Apprendi* and *Blakely*, no jury determination occurred before Hale received an enhanced sentence for his noncapital crimes.  It was not until 2006 that the Ohio Supreme Court

recognized that certain portions of the Ohio state criminal code (including Ohio Rev. Code §§ 2929.14(C) and (E)(4)) were unconstitutional under *Apprendi* and *Blakely*. *See Foster*, 845 N.E.2d at 490–92.

Hale did not object to his sentence when it was first entered against him at trial. However, in subsequent proceedings, Hale began to raise a *Blakely* argument, rightly noting that his sentence relied on a statutory provision that the Ohio Supreme Court had found to violate *Blakely*. In 2008, his appeal reached the Ohio Supreme Court, which denied his claim. *State v. Hale*, 892 N.E.2d 864, 907–08 (Ohio 2008). The court first found that, because Hale had not raised the *Blakely* issue at sentencing, he had waived that objection on appeal, and could only prevail if the noncapital sentencing failed to withstand even plain-error review. *Id.* at 908. And because the court subsequently found that no plain error existed, the violation of Hale's constitutional rights did not warrant overturning the sentence. *Ibid.*

As the last reasoned state court decision on Hale's noncapital-sentencing claim, the 2008 Ohio Supreme Court opinion is the basis of our review of this issue. *See Barton v. Warden, S. Ohio Corr. Facility*, 786 F.3d 450, 463 (6th Cir. 2015) (per curiam) (explaining that "[t]he last-reasoned-decision rule . . . applies separately to each claim within a case."). And as with Hale's first claim, this second claim is subject to deferential review under AEDPA. *Villagarcia v. Warden, Noble Corr. Inst.*, 599 F.3d 529, 533 (6th Cir. 2010); *see Stewart v. Trierweiler*, 867 F.3d 633, 638 (6th Cir. 2017) (clarifying that a state court's plain-error review triggers AEDPA deference). Accordingly, we will not disturb the Ohio Supreme Court's decision unless it unreasonably applied clearly established federal law in conducting its harmless-error review. *See Mitchell v. Esparza*, 540 U.S. 12, 18 (2003). And because we hold that the Ohio Supreme Court's ruling reasonably adhered to United States Supreme Court precedent, AEDPA mandates that we also deny Hale's second claim for habeas relief.

There is no real dispute that, at the time of Hale's sentencing, Ohio Rev. Code §§ 2929.14(C) and (E)(4) were unconstitutional under then-existing Supreme Court precedent.[3]

---

[3]The Warden also argues that this claim is procedurally defaulted, because it was the result of plain-error review. We need not resolve this procedural-default question, as the merits are straightforward. *Hudson v. Jones*, 351 F.3d 212, 216 (6th Cir. 2003).

To be sure, in *Oregon v. Ice*, 555 U.S. 160 (2009), the Court partially reversed course on *Apprendi* and *Blakely*, holding that judicial factfinding is proper when a court imposes consecutive sentences. But *Ice* only addressed the issue of Hale's consecutive sentences; it did nothing to alter *Apprendi*'s or *Blakely*'s holdings against imposing an enhanced sentence based on judicial factfinding, which Hale received when the trial court (and not the jury) found he had committed "the worst form" of his noncapital offenses. For these reasons, we agree that the trial court's imposition of enhanced sentences violated Hale's constitutional right to a jury trial.

But a constitutional error in a criminal proceeding, standing alone, may not automatically require reversal; in fact, it frequently will not. *Neder v. United States*, 527 U.S. 1, 8 (1999). Only those errors serious enough to be "structural" require automatic reversal. *Ibid.* (quoting *Johnson v. United States*, 520 U.S. 461, 468 (1997)). And in the instance of all *Apprendi* and *Blakely* violations, the Supreme Court had already explained by 2008 (the year of the last reasoned state-court opinion) that "[f]ailure to submit a sentencing factor to the jury . . . is not structural error." *Washington v. Recuenco*, 548 U.S. 212, 222 (2006). Accordingly, instead of awarding automatic reversal, we respond to *Apprendi-Blakely* errors by subjecting them to harmless-error review. *United States v. Mack*, 729 F.3d 594, 608 (6th Cir. 2013). And under our precedents, a failure to submit a sentencing factor to the jury is harmless so long as a "'jury would have returned the same verdict absent the error[.]'" *Owens v. Parris*, 932 F.3d 456, 460 (6th Cir. 2019) (alteration in original)(quoting *Recuenco*, 548 U.S. at 221).

In its ruling on Hale's claim in 2008, the Ohio Supreme Court plainly stated that "'[n]othing in the record suggests that the noncapital sentencing would have been different if [the defendant] had been sentenced in accordance with *Blakely* and *Foster*.'" *State v. Hale*, 892 N.E.2d at 908 (quoting *State v. Frazier*, 873 N.E.2d 1263, 1297–98 (Ohio 2008) (alteration in original)). In other words, the Ohio Supreme Court concluded that a jury would have come to the same conclusion as Hale's trial court judge, by determining both that Hale's crimes were the "worst form" of the noncapital offenses, and that Hale was under the court's control when he killed Green. It makes no difference that the Ohio Supreme Court engaged in the *Apprendi-Blakely* harmlessness analysis through a plain-error lens, as the two standards "normally require[] the same kind of inquiry" with respect to whether the defendant's substantial rights

have been affected.  *United States v. Olano*, 507 U.S. 725, 734 (1993); *State v. Barnes*, 759 N.E.2d 1240, 1247 (Ohio 2002) (applying the *Olano* standard to plain-error review).

Under AEDPA's deferential standard, we agree that it was reasonable for the Ohio Supreme Court to conclude that, even without this error, a jury would have returned the same sentence as the trial judge.  As an initial matter, it is undisputed that Hale was on parole when he killed Green, meaning that he was under the court's control.  It was clearly reasonable for the Ohio Supreme Court to conclude that a jury would have made this determination, had the state trial proceedings comported with *Blakely*.

With regards to the "worst offense" enhancement, Hale's noncapital crimes were aggravated robbery, evidence tampering, escape, and having a weapon under disability.  It is reasonable to conclude that a jury would find aggravated robbery that coincides with luring a victim to a premeditated, execution-style murder to be the "worst form" of the offense. Likewise, it is reasonable to conclude that the "worst forms" of evidence tampering and escape are those that involve covering up a murder by wrapping the victim's body in trash bags, dumping the body in a spare room, and destroying or stealing the victim's possessions.  Notably, in convicting Hale of aggravated murder and recommending a death sentence, Hale's jury clearly rejected his framing of the case, and instead sided with the prosecution's theory of premeditation and robbery; we therefore cannot say it was unreasonable for the Ohio Supreme Court to rule that the same jury would have found Hale's conduct to be "the worst form" of his noncapital offenses.

Hale cites numerous other state cases in which defendants engaged in "worse" forms of aggravated robbery, which involve potentially even more disturbing facts than the facts of his case.  *See, e.g., State v. Sowell*, 71 N.E.3d 1034 (Ohio 2016).  But this line of argument misunderstands the posture of our habeas review: it is not our role to independently determine, as a matter of first impression, whether Hale truly committed the "worst form" of his noncapital offenses.  Rather, the only question before us is whether it was *reasonable* for the Ohio Supreme Court to conclude that Hale's jury would find his conduct to be the "worst form" of the charged offenses.  As with Hale's first claim, we cannot say this exercise of plain-error review was so unreasonable that it violates AEDPA.

As a final note, Hale raises a related subclaim here that his trial counsel was ineffective for failing to raise a *Blakely*-based objection to the trial court's noncapital sentencing; because counsel never made the objection, Hale's *Blakely* argument was waived on appeal, and reviewed only under the deferential plain-error standard.  The Ohio Supreme Court dismissed this ineffective-assistance subclaim, stating that "failure to object to error, alone, is not enough to sustain a claim of ineffective assistance of counsel."  *State v. Hale*, 892 N.E.2d at 907 (quoting *State v. Holloway*, 527 N.E.2d 831, 837 (Ohio 1988)).

As with Hale's previous claims, we review the Ohio Supreme Court's decision for reasonableness under AEDPA.  *See Lundgren v. Mitchell*, 440 F.3d 754, 762 (6th Cir. 2006).  Under our precedents, "any single failure to object usually cannot be said to have been error unless the evidence sought is so prejudicial to a client that failure to object essentially defaults the case to the state."  *Id.* at 774.  Otherwise, failure to object will generally not fall to the level of constitutionally deficient counsel.  *Engle v. Isaac*, 456 U.S. 107, 134 (1982).

In its decision, the Ohio Supreme Court correctly stated that failure to make a single objection is typically insufficient to sustain an ineffective-assistance-of-counsel claim.  And in applying that constitutional standard, the court reasonably concluded that none of Hale's claims of failed objections were "so compelling" or "prejudicial" as to sustain a finding of ineffective assistance.  *State v. Hale*, 892 N.E.2d at 907.  Accordingly, Hale's final subclaim—that his trial counsel's failure to object to the *Blakely* error constituted ineffective assistance—is denied.

## V. CONCLUSION

For the foregoing reasons, petitioner Delano Hale's petition for a writ of habeas corpus is DENIED, and the judgment of the district court below is AFFIRMED.